WIGGINS, Justice.
A juvenile offender convicted of first-degree murder appeals his resentencing to life in' prison without the possibility of parole. In this appeal, we determine the factors a court must use when it sentences a juvenile offender for first-degree murder. Because the district court did not have the benefit of this decision when it sentenced the juvenile, we vacate the sentence and remand for resentencing. We do not reach the issue as to whether a sentence of life in prison without parole categorically violates the Iowa Constitution’s prohibition against cruel and unusual punishment, because we are remanding the case for resentencing.
I. Background Facts and Proceedings.
On August 23, 2008, Damion Seats, who was seventeen years old at the time, went *548 to a party at a friend’s house in .Mason City. While at the party, Seats’s friend, Andre Wells revealed he had a handgun in his pocket. In the early morning hours of August 24, Seats and Wells convinced another friend, Jamie McFarland, to give them and two acquaintances a ride from the party to Reuben Ramirez’s house.
Earlier that month, Seats initiated a fight with Ramirez at Ramirez’s house. During the fight, Seats hit Ramirez on the head with a brick. On the evening of the party, Seats was concerned that Ramirez would report the brick incident to the police. Before leaving for Ramirez’s house, Seats and Wells placed the loaded gun in the trunk of the car.
When the vehicle arrived at Ramirez’s house, Seats instructed McFarland to park in the alley. Seats and Wells then tied t-shirts around their faces, retrieved the loaded handgun from the trunk, and entered the residence through a back door. When Seats and Wells entered the house Ramirez was not home, but Isidoro Cervantes Erreguin, who stayed with Ramirez at times, and Cervantes’s brother were. Both were in the living room, asleep oh different couches. Seats approached the living room couch where Cervantes was sleeping and shot him five times. Four of the bullets entered Cervantes’s back and the fifth entered his chest. After Seats and Wells fled, paramedics arrived at Ramirez’s house and attempted to perform CPR on Cervantes. The paramedics declared Cervantes dead at the scene.
Seats and Wells returned to McFarland’s waiting car. After the group left Ramirez’s house, Seats wrapped the handgun in a shirt and hid it under some bushes near his brother’s apartment.
On the afternoon of August 24, Seats came to the police department and asked to speak with investigators. Seats met with the case agent assigned to lead the murder investigation, Division of Criminal Investigation Special Agent Chris Calla-way. Seats had reportedly heard from his friends that the police mentioned his name as a possible suspect in Cervantes’s murder. Seats stated he had come to the police station voluntarily in order to clear his name. Special Agent Callaway interviewed Seats for about two hours.
Seats recounted being at a Mend’s party on the night of the 23rd and said he stayed there until about 3:00 a.m. on the 24th. Seats acknowledged that after the party, he, Wells, and two acquaintances got a ride from McFarland. However, according to Seats, McFarland took the two acquaintances home, then dropped off Wells in a Walmart parking lot where Wells planned to meet up with another acquaintance. Seats told Special Agent Callaway that McFarland then drove him to another Mend’s house where he stayed the night. Seats stated he arrived at this Mend’s house around 4:00 a.m. on August 24 and slept there until about 11:00 a.m. He denied any involvement in the murder. The police permitted Seats to leave the station after the interview, but they continued to conduct surveillance on Seats.
While Special Agent Callaway was interviewing Seats, Wells came to the police department and turned over the gun Seats had hidden in the bushes. Based on Wells’s version of events, the police arrested Seats that evening. The police brought Seats back to the station for another interview. This time Special Agent Callaway and Special Agent in Charge Jeff Jacobson were present and recorded the interview.
After Mirandizing Seats, the agents informed him they had recovered the gun and asked for his version of events. Seats initially continued to deny any involvement in the murder, but then told investigators he would tell them anything they wanted *549 to know if he could speak to his girlfriend. The police allowed Seats to speak to both his girlfriend and his mother during the interview. When his mother asked him why he had shot Cervantes, he stated that he had intended to kill Ramirez to keep him from pressing charges. He went on to say, “I wasn’t thinking of anybody this would’ve hurt if I got caught; I didn’t think I was gonna get caught....” After the phone call to his mother, Seats drew a diagram of Ramirez’s house and indicated where he entered the house, where the occupants were sleeping, and where he stood when he shot Cervantes. Seats also told investigators he felt remorse for shooting an innocent man.
AGENT: When did you realize it wasn’t Reuben? A. Afterwards. Afterwards, like, I shot and I looked and, um, it ain’t even him. And that’s really what made me feel bad because that night, that dude wasn’t even there. Like, he ain’t even had nothing to do with that. So I killed an innocent person. That’s what really ate me up, like, I killed somebody innocent who didn’t have to die.
On September 9, the county attorney filed a trial information charging Seats, Wells, and McFarland jointly with first-degree murder and first-degree burglary. See Iowa Code §§ 707.1, .2 (2009); id. §§ 713.1, .3.
Notwithstanding his confession, Seats pled not guilty and went to trial separately from the other defendants. The jury found Seats guilty of both first-degree murder and first-degree burglary.
On October 26, 2009, as required by Iowa law, the court sentenced Seats to life without parole on the murder charge. See Iowa Code § 902.1 (“Upon a ... verdict of guilty, ... the court shall enter a judgment of conviction and shall commit the defendant into the custody of the director of the Iowa department of corrections for the rest of the defendant’s life.... [A] person convicted of a class ‘A’ felony shall not be released on parole unless the governor commutes the sentence to a term of years.”). It also sentenced Seats concurrently to twenty-five years imprisonment on the burglary conviction. See id. § 902.9(2). The court of appeals affirmed his convictions.
On August 17, 2011, Seats filed a motion to correct an illegal sentence. At that time, Miller v. Alabama, 567 U.S. -, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), was pending before the United States Supreme Court. The district court continued the hearing on Seats’s motion until the Supreme Court rendered a decision. Shortly after Miller was decided, but before the trial court heard Seats’s motion, Iowa’s Governor commuted the sentences of all juveniles previously convicted of first-degree murder to a life sentence with the possibility of parole after sixty years. Seats requested and the district court granted a further postponement until we had decided a number of pending cases concerning this commutation and other aspects of juvenile sentencing.
On August 16, 2013, in State v. Ragland, we held the Governor’s blanket commutation of the juveniles’ life without parole sentences to life with eligibility for parole after sixty years did not affect the constitutional requirement that the district court proceed with an individualized hearing as required by Miller. See State v. Ragland, 836 N.W.2d 107, 121-22 (Iowa 2013). The district court scheduled an individualized resentencing hearing for Seats after the filing of the Ragland opinion.
In 2013, the court ordered a new presen-tence investigation report, which Barbara Brandt, a Mason City parole officer, prepared and filed. The report noted Seats had a difficult childhood, including a lack of adult supervision and exposure to gang *550 violence at a very early age. It also indicated Seats had a history of homelessness and alcohol and drug abuse. The report indicated Seats had not graduated high school or completed his GED, but he had completed a literacy program while incarcerated. The report detailed Seats’s juvenile criminal history. Seats told the parole officer that the majority of the people in his life had been negative influences, although some friends and associates in Mason City were positive influences. According to the report, Seats told the parole officer “[t]he difference between defendant and his co-defendants was that they had supportive family members and that wasn’t the case for him.”
Additionally, the report noted the prison had disciplined Seats ten times, including for fighting, for possession of intoxicants, and twice for theft and unauthorized possession. Finally, the report indicated Seats held a job during his time in prison, but as of October 29, 2013, he was not employed due to his status. However, the. report stated his case manager anticipated Seats would be eligible to work again in November 2013. The report did not make a sentencing recommendation because the court had previously sentenced Seats.
The court held a resentencing hearing on November 22. The court described the purpose of the proceeding as follows:
A series of U.S. Supreme Court cases and Iowa Supreme Court cases over the past several years have made clear that those two courts consider sentences of life without the opportunity for parole entered as to offenders who were juveniles at the time of the offense [to be] cruel and unusual punishment unless there is a consideration of individual factors. And so I believe that the parties might be presenting evidence on those individual factors today and will be arguing their positions as to what the sentence should be.
Seats testified at the hearing about his childhood. He explained his father stopped living with the family when Seats was four years old and Seats had little contact with his father growing up. Seats’s father was a drug addict and used drugs when he was around Seats and his siblings. At this time, Seats has no relationship with his father.
Seats told the court as a young boy he .considered his uncle a role model, even though his uncle had been in prison for drugs and attempted murder. Gang members murdered Seats’s uncle in front of Seats when he was seven years old.
Seats’s mother has lived in Chicago since 2006, when she returned to take care of Seats’s brother who was shot in a gang incident. Prior to her return to Chicago, Seats lived with his mother, moving abruptly between Virginia, Illinois, Wisconsin, and Iowa.
After his father left, Seats’s mother began a relationship with Greg, a gang member in Chicago. Greg physically abused his mother in front of Seats and his siblings. Seats remembered Greg hitting his mother in the head with a hammer.
By the time Seats was ten years old, Seats’s mother had a new boyfriend, Keith, who was abusive to Seats’s mother and all of the children. Keith was physically, verbally, and emotionally abusive, using household items to hit the children. Seats recalled all the children sleeping under their beds to avoid Keith’s beatings. Further, while she was with Keith, Seats’s mother also became abusive towards the children and at one point Seats’s grandmother removed the children from their home for a few months to keep them safe. Seats reported he stayed out' all night in *551 Chicago to avoid the violence while Keith was in the home.
Seats has two brothers and one sister. Both of Seats’s brothers have been imprisoned at one time for drugs and violent crimes. Seats’s sister also has a history of drug use and criminal charges.
Seats was involved in gangs since the age of thirteen. When his mother moved back to Chicago in 2006 Seats stayed in Mason City, living with his brother who was approximately twenty years old. His brother allowed Seats to use cocaine, ecstasy, marijuana, and alcohol. By fifteen years old Seats was essentially homeless, staying with friends and gang members. At the age of sixteen, a rival gang shot Seats three times to get back at Seats’s brother, who was in prison at the time. Seats also sold drugs as a teenager.
Seats stated he had received counseling and treatment through the juvenile court system but continued to commit the offenses noted in his juvenile record. Seats testified that some time before Cervantes’s murder he had worked for two weeks at a grocery store but decided he did not want to do that and quit. Seats also continued to deny murdering Cervantes. As he put it, “[I]t didn’t happen.” Seats informed the court he was taking steps to better himself, such as being more patient and trying to control his drug and alcohol addictions. He testified he would take full advantage of opportunities to finish his GED and learn a job if they were made available to him.
At the sentencing hearing, Seats asked for immediate parole eligibility and for the court to “rely on the parole board to determine when [he] or anybody in his position has developed to the point where he is no longer a threat to society and would be a productive member of society.” He also urged the court to impose a term-of-years sentence, rather than a life term, because it would allow Seats to earn good time on his sentence and “the good time is an incentive for him to accomplish the very things that we are talking about right now ... to get the parole that he would be seeking.”
The State argued Seats’s case warranted a sentence of life without parole. It urged the concern for juvenile brain development is less in a case where the offender, like Seats, was just months away from his eighteenth birthday. It maintained that the nature of Seats’s crime and the surrounding circumstances did not support a finding that it was the result of youthful incompetency. Finally, the State pointed to Seats’s extensive juvenile record, his disciplinary violations in prison, and the fact that he still denied responsibility for the murder as evidence that he was not amenable to rehabilitation.
At the conclusion of the hearing, the district court indicated it would take the weekend to consider the testimony and evidence before rendering a decision on Seats’s resentencing. Four days later, the court issued its decision on the record. The court stated it was conducting a re-sentencing based on statutory factors and the factors set forth in Miller:
[T]he court is to consider all pertinent information, including the presentence investigation report and victim impact statements. “All pertinent information” includes the nature of the offense and the defendant’s character, propensity to reoffend, chances for reform, age, family circumstances, need for mental health treatment, need for substance abuse treatment, history of suffering abuse, employment history, criminal history, behavior while on probation or while incarcerated, remorse or lack thereof, and concern about the victims or lack thereof.... In regard to a juvenile defendant, the court must also weigh the *552 defendant’s age and age-attendant characteristics against the seriousness of the crime.... It must take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.
Applying these considerations, the court stated this was one of the “unusual” cases warranting life without parole. The court addressed Seats’s personal characteristics and potential for reform, using his childhood circumstances, the negative family influences in his life, and his lack of a stable support system as a factor against him:
When he killed Isidoro Cervantes Erre-guin, Mr. Seats was only months away from being an adult. He already had a history of juvenile criminal activity. Previous interventions and attempts at rehabilitation had failed. Mr. Seats has shown no ability or willingness to maintain employment. He has shown little ability to abstain from the use of, alcohol and controlled substances, and he has no family or' other support outside of the criminal community. He has not made significant rehabilitative efforts in prison, and has instead incurred ten major disciplinary reports.
The court went on to discuss the nature of Seats’s crime. The'court acknowledged Seats’s troubled youth, but concluded it did not outweigh the serious nature of Seats’s crime and behavior:
I have considered the defendant’s unfortunate background and the difficulties he faced in his youth. I am not unsympathetic to the bleakness and desperation of that life. But I fail to find here the “attendant characteristics” of youth that might outweigh the seriousness of the crime or otherwise require a less sentence than one that would be imposed on an adult.
Ultimately, the court granted Seats’s motion to correct the illegal sentence “[t]o the extent the previous sentence was imposed without individualized consideration of the circumstances.” It otherwise denied the motion and upheld Seats’s sentence of life with parole eligibility after sixty years as commuted by the governor.
Seats appealed, and we retained the appeal.
II. Issues.
The defendant raises three issues on appeal. First, whether the district court’s imposition of life in prison without the possibility of parole categorically violates article I, section 17 of the Iowa Constitution, which prohibits cruel and, unusual punishment. Next, if it does not, does the sentence imposed by the court upholding the Governor’s commutation of his original sentence to sixty years before he is eligible for parole violate article I, section 17 of the Iowa Constitution. Third, whether the sentence of life without the possibility of parole, even after discarding the Governor’s commutation, as applied to the facts of this case constitute cruel and unusual punishment. We can resolve this appeal by addressing the last issue.
III. Standard of Review.
We have expressed three different standards of review when a defendant challenges his or her sentence on appeal. We use the abuse of discretion standard if the sentence is within the statutory limits. When reviewing a sentence for an abuse of discretion, we have said:
In applying the abuse of discretion standard to sentencing decisions, it is important to consider the societal goals of sentencing criminal offenders, which focus on rehabilitation of the offender and the protection of the community from further offenses. It is equally im *553 portant to consider the host of factors that weigh in on the often arduous task of sentencing a criminal offender, including the nature of the offense, the attending circumstances, the age, character and propensity of the offender, and the chances of reform.... The application of these goals and factors to an individual case, of course, will not always lead to the same sentence. Yet, this does not mean the choice of one particular sentencing option over another' constitutes error. Instead, it explains the discretionary nature of judging and the source of the respect afforded by the appellate process.
Judicial discretion imparts the power to act within legal parameters according to the dictates of a judge’s own conscience, uncontrolled by the judgment of others. It is essential to judging because judicial decisions frequently are not colored in black and white. Instead, they deal in differing shades of gray, and discretion is needed to give the necessary latitude to the decision-making process. This inherent latitude in the process properly limits our review. Thus, our task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds.
State v. Formaro, 638 N.W.2d 720, 724-25 (Iowa 2002) (citations omitted). In other words, a district court did not abuse its discretion if the evidence supports the sentence. State v. Valin, 724 N.W.2d 440, 445 (Iowa 2006).
We also review sentences for correction of errors at law. We do so when the defendant challenges the legality of a sentence on nonconstitutional grounds. Id. at 443-44. We use the correction of errors at law standard when the statute does not authorize the sentence. State v. Freeman, 705 N.W.2d 286, 287 (Iowa 2005).
More recently, we have begun to decide cases involving constitutional attacks on the validity of a sentence. See Ragland, 836 N.W.2d at 109-10 (examining whether a defendant’s sentence amounts to cruel and unusual punishment under the Iowa Constitution); State v. Pearson, 836 N.W.2d 88, 89 (Iowa 2013) (same); State v. Null, 836 N.W.2d 41, 45 (Iowa 2013) (same); State v. Bruegger, 773 N.W.2d 862, 866, 886 n. 9 (Iowa 2009) (same). When a defendant attacks the constitutionality of a sentence, our review is de novo. Ragland, 836 N.W.2d at 113; Pearson, 836 N.W.2d at 94; Null, 836 N.W.2d at 48; Bruegger, 773 N.W.2d at 869.
Therefore, we apply the de novo standard to this appeal because Seats is attacking his sentence on constitutional grounds.
IY. Analysis.
The United States Supreme Court decided that although a sentencing court has the discretion to sentence a juvenile offender who commits murder to the harshest penalty possible — life in prison without the possibility of parole — such a sentence should be uncommon. Miller, 567 U.S. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424. Here, the district court sentenced Seats to the harshest sentence. Seats argues this is not the uncommon circumstance to do so. To analyze Seats’s argument, we review the Supreme Court cases dealing with juvenile sentencing as well as recent cases under the Iowa Constitution dealing with cruel and unusual punishment in the juvenile context.
A. United States Supreme Court Jurisprudence. Miller is the most recent Supreme Court opinion dealing with the sentencing of juvenile offenders to life in prison without parole when the juvenile *554 commits a murder. Before Miller, the Court decided Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) and Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).
In Roper, the Supreme Court held executing juveniles who had committed capital crimes violated the Eighth and Fourteenth Amendments of the United States Constitution. 543 U.S. at 578, 125 S.Ct. at 1200, 161 L.Ed.2d at 28. The seventeen-year-old defendant in Roper took a woman from her home, tied her up — with duct tape covering her head and wire binding her extremities — and threw her into a river to drown. Id. at 556-57, 125 S.Ct. at 1187-88, 161 L.Ed.2d at 13.
In support of its holding, the Court recognized three general differences between juveniles and adults that “render suspect any conclusion that a juvenile falls among the worst offenders.” Id. at 569-70, 125 S.Ct. at 1195, 161 L.Ed.2d at 21-22. First, juveniles have “ ‘[a] lack of maturity and an underdeveloped sense of responsibility.’” Id. at 569, 125 S.Ct. at 1195, 161 L.Ed.2d at 21 (quoting Johnson v. Texas, 509 U.S. 350, 367, 113 S.Ct. 2658, 2668, 125 L.Ed.2d 290, 306 (1993)). The Court recognized these characteristics “ ‘often result in impetuous and ill-considered actions and decisions.’ ” Id. (quoting Johnson, 509 U.S. at 367, 113 S.Ct. at 2668, 125 L.Ed.2d at 306). Second, juveniles are more susceptible than adults are to “negative influences and outside pressures” and “juveniles have less control, or less experience with control, over their own environment.” Id. at 569, 125 S.Ct. at 1195, 161 L.Ed.2d at 22. Third, a juvenile’s personality and character traits are still forming, and are not as fixed as an adult’s personality and character traits are. Id. at 570, 125 S.Ct. at 1195, 161 L.Ed.2d at 22. As a result of these differences, there is a greater possibility “that a minor’s character deficiencies will be reformed” and “ ‘the impetuousness and recklessness that may dominate in younger years can subside.’ ” Id. at 570, 125 S.Ct. at 1195-96, 161 L.Ed.2d at 22 (quoting Johnson, 509 U.S. at 368, 113 S.Ct. at 2668, 125 L.Ed.2d at 306).
Next, in Graham, the Court held the Eighth Amendment prohibits states from sentencing juveniles who did not commit homicide to life in prison without parole, and the states sentencing these juveniles to a life sentence must provide a “realistic opportunity to obtain release before the end of that term.” 560 U.S. at 82, 130 S.Ct. at 2034, 176 L.Ed.2d at 850. The defendant in Graham committed a number of criminal offenses including armed burglary, armed robbery, and fleeing from police. Id. at 53-55, 130 S.Ct. at 2018-19, 176 L.Ed.2d at 832-33.
The Court relied upon the reasoning articulated in Roper regarding juveniles’ underdeveloped sense of responsibility and lack of maturity to demonstrate that “[a] juvenile is not absolved of responsibility for his actions, but his transgression ‘is not as morally reprehensible as that of an adult.’ ” Id. at 68, 130 S.Ct. at 2026, 176 L.Ed.2d at 841 (quoting Thompson v. Oklahoma, 487 U.S. 815, 835, 108 S.Ct. 2687, 2699, 101 L.Ed.2d 702, 719 (1988) (plurality opinion)). The Court went on to recognize “developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds ... [and the] parts of the brain involved in behavior control continue to mature through late adolescence.” Id. The Court also identified that juveniles are more capable of changing their character and reforming than adults are. Id. at 68, 130 S.Ct. at 2026-27, 176 L.Ed.2d at 841-42. The Court noted for juveniles a life sentence without parole
means denial of hope; it means that good behavior and character improve *555 ment are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.
Id. at 70, 130 S.Ct. at 2027, 176 L.Ed.2d at 842 (internal quotation marks omitted). Further, the Court in both Graham and Rcyper determined none of the penological justifications for sentencing — retribution, deterrence, incapacitation, or rehabilitation — are served when imposing either of these sentences on juveniles. Graham, 560 U.S. at 71-74, 130 S.Ct. at 2028-30, 176 L.Ed.2d at 843-45; Roper, 543 U.S. at 571-72, 125 S.Ct. at 1196-97, 161 L.Ed.2d at 23.
In Miller, the Court decided it did not have to reach a categorical challenge to a sentence of life in prison without parole for a juvenile who commits murder as it did in Roper and Graham. Miller, 567 U.S. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424. The Court did not reach the categorical challenge because its holding was sufficient to decide the cases before the Court in Miller. Id. In not addressing the categorical challenge, the Court made it clear that the “appropriate occasions for sentencing juveniles to this harshest possible penalty, [life in prison without the possibility of parole,] will be uncommon.” Id. The Miller Court required judges or juries “must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles.” Id. at-, 132 S.Ct. at 2475, 183 L.Ed.2d at 430.
In reaching this decision, the Court built on its jurisprudence espoused in Roper and Graham. In Miller, the court reiterated there is a significant constitutional difference between children and adults that “diminish[es] the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.” Id. at -, 132 S.Ct. at 2465, 183 L.Ed.2d at 419. This is
especially so because of the great difficulty we noted in Roper and Graham of distinguishing at this early age between “the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.” Although we do not foreclose a sentencer’s ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.
Id. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424 (quoting Roper, 543 U.S. at 573, 125 S.Ct. at 1197, 161 L.Ed.2d at 24).
B. Application of Supreme Court Jurisprudence to Juveniles in Iowa. We have previously discussed the role Roper, Graham, and Miller play in sentencing a juvenile subject to a mandatory minimum sentence for a nonhomicide crime. Null, 836 N.W.2d at 74-75. In a case in which the court has discretion to sentence a juvenile to life in prison without the possibility of parole, Miller and Null require the sentencing judge to consider the following factors before sentencing a juvenile to life in prison without the possibility of parole.
First, the court must start with the Supreme Court’s pronouncement that sentencing a juvenile to life in prison without the possibility of parole should be rare and uncommon. Miller, 567 U.S. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424; Null, 836 N.W.2d at 75. Thus, the presumption for any sentencing judge is that the judge should sentence juveniles to life in prison with the possibility of parole for murder unless the other factors require a different sentence.
*556 Second, the sentencing judge must recognize that “children are constitutionally different from adults.” Miller, 567 U.S. at -, 132 S.Ct. at 2464, 183 L.Ed.2d at 418. We have explained, “The constitutional difference arises from a juvenile’s lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile’s character.” Null, 836 N.W.2d at 74; see also Miller, 567 U.S. at -, 132 S.Ct. at 2464, 183 L.Ed.2d at 418.
In sentencing the juvenile, offender, the court must take into account any information in the record regarding “the family and home environment that surrounds him — and from which he cannot usually extricate himself — no matter how brutal or dysfunctional.” Miller, 567 U.S. at -, 132 S.Ct. at 2468, 183 L.Ed.2d at 423. In examining the “family and home environment,” the judge shall consider any information regarding childhood abuse, parental neglect, personal and family drug or alcohol abuse, prior exposure to violence, lack of parental supervision, lack of an adequate education, and the juvenile’s susceptibility to psychological or emotional damage. People v. Gutierrez, 58 Cal.4th 1354, 171 Cal.Rptr.3d 421, 324 P.3d 245, 268-69 (2014). The sentencing judge should consider these family and home environment vulnerabilities together with the juvenile’s lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure as mitigating, not aggravating, factors. Miller, 567 U.S. at -, 132 S.Ct. at 2467-69, 183 L.Ed.2d at 422-24; Null, 836 N.W.2d at 74-75.
Third, the sentencing judge must consider “the circumstances of the homicide offense, including the extent of [the juvenile’s] participation in the conduct and the way familial and peer pressures may have affected him.” Miller, 567 U.S. at -, 132 S.Ct. at 2468, 183 L.Ed.2d at 423. One of the circumstances the sentencing judge needs to consider is whether substance abuse played a role in the juvenile’s commission of the crime. Id. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 423.
Finally, the sentencing judge must take into consideration that “£j]uve-niles are more capable of change than are adults” and that as a result, “their actions are less likely to be evidence of ‘irretrievably depraved character.’ ” Graham, 560 U.S. at 68, 130 S.Ct. at 2026, 176 L.Ed.2d at 841 (quoting Roper, 543 U.S. at 570, 125 S.Ct. at 1195, 161 L.Ed.2d at 22). “[M]ost juveniles who engage in criminal activity are not destined to become lifelong criminals.” Null, 836 N.W.2d at 75; see also Graham, 560 U.S. at 68, 130 S.Ct. at 2026, 176 L.Ed.2d at 841; Roper, 543 U.S. at 570, 125 S.Ct. at 1195-96, 161 L.Ed.2d at 22. As we said in Null, a case decided under the Iowa Constitution, “[b]ecause incorrigibility is inconsistent with youth, care should be taken to avoid an irrevocable judgment about [an offender’s] value and place in society.” Null, 836 N.W.2d at 75 (internal quotation marks omitted). It is very difficult for a judge to distinguish between “ ‘the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.’ ” Miller, 567 U.S. at-, 132 S.Ct. at 2469, 183 L.Ed.2d at 424 (quoting Roper, 543 U.S. at 573, 125 S.Ct. at 1193, 161 L.Ed.2d at 24). The sentencing judge should only sentence those juveniles to life in prison without the possibility of parole whose crime reflects irreparable corruption.
We note the district court emphasized that Seats was a seventeen-year-old at the time the crime was committed. We recognize that in Roper, the line between being a juvenile and an adult was drawn for cruel and unusual punishment purposes at *557 eighteen years of age. See Roper, 543 U.S. at 574, 125 S.Ct. at 1197-98, 161 L.Ed.2d at 24-25. Yet, as we stated in Null, current science demonstrates that the human brain continues to develop into the early twenties. 836 N.W.2d at 55. As stated by two leading scholars in adolescent development and the law, “[t]he research clarifies that substantial psychological maturation takes place in middle and late adolescence and even into early adulthood.” Elizabeth S. Scott & Lawrence Steinberg, Rethinking Juvenile Justice 60 (2008). Thus, Scott and Steinberg emphasize that “adolescents, even at age sixteen and seventeen, are immature in their psychosocial and emotional development, and this likely affects their decisions about involvement in crime in ways that distinguish them from adults.” Id. at 131. In light of the science, the fact that a defendant is nearing the age of eighteen does not undermine the teachings of Miller and Null
We must be cognizant of the fact that a sentence of life in prison without the possibility of parole for a juvenile is the equivalent of the death penalty for juveniles. As Graham so aptly observed,
Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation.
Graham, 560 U.S. at 79, 130 S.Ct. at 2032, 176 L.Ed.2d at 848.
Even if the judge sentences the juvenile to life in prison with parole, it does not mean the parole board will release the juvenile from prison. Once the court sentences a juvenile to life in prison with the possibility of parole, the decision to release the juvenile is up to the parole board. Iowa Code § 904A.4 (2015). If the parole board does not find the juvenile is a candidate for release, the juvenile may well end up serving his or her entire life in prison.
In Null, we found when a judge sentences a juvenile to a mandatory minimum sentence, the judge must state his or her reasons on the record for imposing such a sentence. Null, 836 N.W.2d at 71, 74. Likewise, if the sentencing judge believes the information in the record rebuts the presumption to sentence a juvenile to life in prison with the possibility of parole and the case is the rare and uncommon case requiring the judge to sentence the juvenile to life in prison without the possibility of parole, the judge must make specific findings of fact discussing why the record rebuts the presumption. “In making such findings, the district court must go beyond a mere recitation of the nature of the crime, which the Supreme Court has cautioned cannot overwhelm the analysis in the context of juvenile sentencing.” Id. at 74-75.
C. Application of Supreme Court Jurisprudence to Seats. On our de novo review, we note the district did not consider the factors a court must consider before sentencing a juvenile to life in prison without the possibility of parole. Factually, the district court appeared to use Seats’s family and home environment vulnerabilities together with his lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure as aggravating, not mitigating, factors.
At the time of sentencing, the district court did not have the benefit of this decision setting forth the factors the court must use and the requirements the court needs to sentence a juvenile convicted of first-degree murder. When this happens, the proper remedy is to remand the case back to the district court to consider the matter consistent with our holding in this *558 opinion. State v. Hildebrand, 280 N.W.2d 393, 397 (Iowa 1979).
Additionally, we need not reach the issue as to whether sentencing a juvenile to life in prison without the possibility of parole categorically violates the Iowa Constitution’s prohibition on cruel and unusual punishment because we are sending this case back to the district court for resen-tencing. Upon resentencing, if the district court finds this is the rare and uncommon case requiring it to sentence Seats to life in prison without the possibility of parole, Seats can appeal his sentence as contrary to Miller. In that appeal, he can make the additional claim that his sentence of life in prison without the possibility of parole categorically violates the Iowa Constitution’s prohibition on cruel and unusual punishment.
Y. Summary and Disposition.
There is no question that juveniles who commit vicious murders deserve severe punishment. However, we cannot lose sight of the fact that juveniles are different from adults due to a juvenile’s lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile’s character. The question the court must answer at the time of sentencing is whether the juvenile is irreparably corrupt, beyond rehabilitation, and thus unfit ever to reenter society, notwithstanding the juvenile’s diminished responsibility and greater capacity for reform that ordinarily distinguishes juveniles from adults. Therefore, we must remand this case for resentencing consistent with this opinion.
. DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.
CADY, C.J., and HECHT and APPEL, JJ., join this opinion. HECHT, J., files a separate concurring opinion. MANSFIELD, J., files a dissenting opinion in which WATERMAN and ZAGER, JJ., join.