# IN THE COURT OF APPEALS OF IOWA

No. 17-0570
Filed September 26, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**IMERE HALL,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Dubuque County, Thomas A. Bitter, Judge.

Imere Hall appeals his convictions of first-degree murder and first-degree robbery following a jury trial. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Kyle P. Hanson, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

In the early morning hours of April 2, 2016, Tacari Minifee shot and killed Collin Brown. Defendant Imere Hall was at the scene of the crime. Following a jury trial, Hall was found guilty of first-degree murder and first-degree robbery by way of aiding and abetting Minifee. Hall appeals,[1] first arguing, as he did at trial, that a break in the action, along with his conduct, evidences he withdrew from the scene and was no longer aiding and abetting Minifee when Minifee killed Brown. He also challenges the constitutionality of his sentence, arguing life without parole for a person who commits a crime at just over the age of eighteen is cruel and unusual punishment and violates equal protection of the laws. Finally, Hall sets out four pro se statements alleging errors without further discussion. Upon our review, we affirm.

### I. Background Facts and Proceedings.

Hall testified at his trial. There, he told the jury the following transpired the night Collin Brown was murdered.

In the late night hours of April 1, 2016, Hall, then eighteen years old, went with Tacari Minifee and Eric Campbell to buy marijuana from Collin Brown. Minifee and Campbell were members of the Dead Money gang, of which Hall was not a member. Hall's friend, Taylor Shaw, drove Hall, Minifee, and Campbell to Brown's neighborhood, but they were unsure of where Brown's home was located. The group then went to a McDonald's restaraunt and ate, and Minifee called someone that knew where Brown lived. A car, driven by Savanna Stotlar, arrived at

---

[1] Hall does not appeal his robbery conviction.

McDonald's, and Shaw, with Hall, Minifee, and Campbell as passengers, followed Stotlar's car to Brown's home in the early morning hours of April 2. Shaw parked the car a distance from Brown's home.

Hall walked up to Brown's door with Minifee and Campbell. Campbell kicked in Brown's door and pulled out a gun. Minifee also had a gun. Hall proceeded inside with Minifee and Campbell.

Brown and his girlfriend, Alecea Lombardi, were inside the home when the three men entered. Minifee and Campbell sought out Brown, and Hall went to Lombardi, who was upset. Hall knew Lombardi and was attempting to calm her when Campbell came to them, pointed his gun at Lombardi, and demanded money. Lombardi grabbed her purse from the couch and gave it to Campbell. Meanwhile, Brown jumped out the window and Minifee pursued him.

Hall fled Brown's home with Campbell, running for the getaway car. While running, Hall saw Brown and someone pursuing Brown but continued to Shaw's car. Then Hall heard two gunshots. Hall got to Shaw's car and told her to go. Minifee then got in Shaw's car, and they drove way.

The next morning, Shaw, Minifee, and Hall were found at Shaw's home and taken in by the police for questioning. Hall admitted he was untruthful with law enforcement officers concerning his connection to the previous night's activities. Hall explained he was afraid both he and Shaw were in danger because they knew Minifee, a gang member, had killed Brown.

Lombardi also testified and gave a different account. Lombardi testified that after the door was kicked in, three men burst in; one tall, one medium height, and one short. All were wearing dark clothing, had bandanas covering their faces, and

hoods over their heads. All had guns. The shorter man came over to her while the other two men beat up Brown. The man who came to her "kept telling [her] that [her and her] kids were going to be okay." She said this person held a gun to her head.

Lombardi testified the tall man came over to her and demanded money, so she got up and got her purse from the couch. She took out her wallet to remove the cash, and the man just took her wallet. Lombardi heard Brown say, in a kind of disguised voice, "Police 9-1-1," and everyone just left. Lombardi ran to check on her children, and then she heard gunshots. She then called 9-1-1.

Shaw, driver of the getaway car, testified Campbell gave her directions to Brown's home but could not find it. The group went to McDonald's and someone was called to assist them in locating Brown's home. Stotlar arrived at the McDonald's, and Shaw followed Stotlar's car to Brown's home. When they got to Brown's home, Stotlar tapped her brake lights to signal they were at the right place. Shaw parked the car some distance from the home. Hall, Minifee, and Campbell then got out of the car and walked toward Brown's home. Shaw turned the car around, switched the lights off, but kept the motor running. After a couple of minutes, Campbell got in the car, and Hall followed as gunshots went off. Shaw started to drive off but waited for Minifee. Once Minifee got in the car, Shaw drove fast from the scene.

Ultimately, the jury found Hall guilty of first-degree murder and robbery for aiding and abetting Minifee.

### II. Discussion.

Hall appeals, arguing he did not aid and abet Minifee because he withdrew

his participation in the crime when he fled Brown's home; consequently, the district court should have granted his motion for judgment of acquittal. He also challenges the constitutionality of a life-without-parole sentence for an eighteen-year-old criminal's conviction. Finally, he raises some issues pro se.

### A. Sufficiency of the Evidence.

"Challenges to the sufficiency of the evidence are reviewed for correction of errors at law." *State v. Hansen*, 750 N.W.2d 111, 112 (Iowa 2008). "We allow a verdict to stand if substantial evidence supports it." *State v. Biddle*, 652 N.W.2d 191, 197 (Iowa 2002). "Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt." *Id.* "We review the evidence in the light most favorable to the State, including legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence." *Id.* "We consider all the record evidence, not just the evidence that supports the verdict." *Id.* "[E]vidence which merely raises suspicion, speculation, or conjecture is insufficient." *State v. Hearn*, 797 N.W.2d 577, 580 (Iowa 2011) (quoting *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992)).

"The Iowa Code provides that those who aid and abet in the commission of a public offense 'shall be charged, tried and punished as principals.'" *Id.* at 580 (quoting Iowa Code § 703.1 (2011)).

> To sustain a conviction on the theory of aiding and abetting, the record must contain substantial evidence the accused assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission. The State must prove the accused knew of the crime at the time of or before its commission. However, such proof need not be established by direct proof, it may be either direct or circumstantial.
>
> Neither knowledge of the crime nor proximity to the crime

scene are enough to prove aiding and abetting. However, they are factors, which with circumstantial evidence such as "presence, companionship, and conduct before and after the offense is committed," may be enough to infer a defendant's participation in the crime. When, as here, intent is an element of the crime charged, a person may be convicted on a theory of aiding and abetting if [he] participates with either the requisite intent, or with knowledge the principal possesses the required intent.

*State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000) (internal citations omitted). Yet, intent can seldom be proved by direct evidence. *See State v. Furlong*, 249 N.W. 132, 134 (Iowa 1933). Consequently, proof of intent usually arises from circumstantial evidence and inferences reasonably drawn from the circumstances. *See State v. Olson*, 373 N.W.2d 135, 136 (Iowa 1985); *see also State v. Henderson*, 908 N.W.2d 868, 878 (Iowa 2018) (finding the circumstantial evidence presented insufficient to establish Henderson knew a gun would be used in the robbery).

The court gave the jury the following instructions on first-degree murder:

> Under Count I, the State must prove all of the following elements of Murder in the First Degree.
> 1. On or about the 2d day of April, 2016, [Hall] aided and abetted someone who shot Collin Brown.
> 2. Collin Brown died as a result of being shot.
> 3. [Hall] or someone he aided and abetted acted with malice aforethought.
> 4. [Hall] or someone he aided and abetted was participating in the offense of Robbery in the First Degree or Robbery in the Second Degree.
> If the State has proved all of the elements, [Hall] is guilty of Murder in the First Degree. If the State has failed to prove any one of the elements, [Hall] is not guilty of Murder in the First Degree . . . .

The court gave the jury the following instructions on first-degree robbery:

> Under Count II, the State must prove all of the following elements of Robbery in the First Degree:
> 1. On or about the 2d day of April, 2016, [Hall] or someone he aided and abetted had the specific intent to commit a theft.

2. To carry out his intention with or without the stolen property, [Hall] or someone he aided and abetted:

a. Committed an assault on Collin Brown; OR

b. Threatened Collin Brown with, or purposely put Collin Brown in fear of immediate serious injury.

3. [Hall] or someone he aided and abetted was armed with a dangerous weapon.

If the State has proved all of the elements, [Hall] is guilty of Robbery in the First Degree. If the State has failed to prove any one of the elements, [Hall] is not guilty of Robbery in the First Degree . . . .

The uniform instruction defining aiding and abetting was given:

All persons involved in the commission of a crime, whether they directly commit the crime or knowingly "aid and abet" its commission, shall be treated in the same way.

"Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove [Hall]'s earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."

The guilt of a person who knowingly aids and abets the commission of a crime must be determined only on the facts which show the part he has in it, and does not depend upon the degree of another person's guilt.

If you find the State has proved [Hall] directly committed the crime, or knowingly "aided and abetted" another person in the commission of the crime, [Hall] is guilty of the crime charged.

The crime charged requires a specific intent. Therefore, before you can find [Hall] "aided and abetted" the commission of the crime, the State must prove [Hall] either had such specific intent or "aided and abetted" with the knowledge the other person who directly committed the crime had such specific intent. If [Hall] did not have the specific intent, or knowledge the other person had such specific intent, he is not guilty.

*See also* Iowa Crim. Jury Instructions 200.8. Finally, the jury was instructed:

A person is "participating in a public offense," during part or the entire period commencing with the first act done directly toward the commission of the offense and for the purpose of committing that offense, and terminating when the person has been arrested or has withdrawn from the scene of the intended crime and has eluded

pursuers, if any there be. A person is "participating in a public offense" during this period whether the person is successful or unsuccessful in committing the offense.

The jury was properly instructed on the law. The jury heard Hall's account, claiming he had no foreknowledge of the robbery and, in any event, he withdrew from the crime before Minifee shot Brown. The jury also heard Lombardi's testimony, wherein Hall was a participant in the robbery. "When the testimony is disputed or if undisputed, when different inferences may be drawn from it, the question is one of fact for the jury." *State v. Martin*, 274 N.W.2d 348, 349 (Iowa 1979); *see also State v. Dalton*, 674 N.W.2d 111, 118 (Iowa 2004) (noting a fact-finder is free to accept or reject witness testimony). The jury heard the evidence and did not believe Hall. Viewing the evidence in the light most favorable to the State, Hall's presence at Brown's home with Minifee and Campbell, along with Hall's entry into Brown's home after Campbell kicked the door in and Lombardi's testimony, the jury could reasonably infer that Hall went to Brown's home with Minifee and Campbell as a full participant in a plan to rob Brown, which ended when Minifee shot Brown. Further, the jury could have reasonably concluded that Hall's participation in the robbery did not terminate as he left Brown's home and ran for the getaway car. Substantial evidence exists to support the jury's verdict. Accordingly, the district court properly denied Hall's motion for judgment of acquittal.

### B. Constitutionality of Life without Parole for Hall.

Hall also challenges the constitutionality of his life-without-parole sentence because he was eighteen-years-old at the time he committed the crime. Our review is de novo. *See State v. Lyle*, 854 N.W.2d 378, 382 (Iowa 2014).

In recent years, the supreme court has created a separate sentencing scheme for juvenile offenders. *See State v. Roby*, 897 N.W.2d 127, 135 (Iowa 2017); *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016); *State v. Louisell*, 865 N.W.2d 590, 603 (Iowa 2015); *State v. Seats*, 865 N.W.2d 545, 555-58 (Iowa 2015); *Lyle*, 854 N.W.2d at 400-04; *State v. Null*, 836 N.W.2d 41, 74-75 (Iowa 2013); *State v. Pearson*, 836 N.W.2d 88, 95-98 (Iowa 2013); *State v. Ragland*, 836 N.W.2d 107, 121-22 (Iowa 2013); *see also State v. Harrison*, 914 N.W.2d 178, 188-202 (Iowa 2018) (discussing in depth the state and federal sentencing landscape for juvenile offenders, application of the felony-murder rule to juvenile offenders, and the sentencing of juvenile offenders under the felony-murder rule). The supreme court has concluded this separate sentencing scheme is required by the constitutional prohibition on cruel and unusual punishment embodied in article I, section 17 of the Iowa Constitution. The factual and legal justifications for the juvenile sentencing scheme are succinctly summarized in *State v. Sweet.* 879 N.W.2d at 830-31 (identifying the critical fourteen points drawn from the federal case law and the three critical principles distilled from the Iowa case law). The primary justifications for the supreme court's juvenile sentencing scheme, and the justifications most relevant here, are medical literature tending to show the brain continues to develop until the age of twenty-five and medical and social science literature tending to show juveniles think and act differently than adults. *See Null*, 836 N.W.2d at 55 (stating the rationale is based on (1) "new" scientific evidence showing "the human brain continues to mature into the early twenties;" and (2) a finding that young people generally "lack the ability to properly assess risks and engage in adult-style self-control"); *see also Harrison*, 914 N.W.2d at 194-95. The

supreme court has used this literature to support the argument "juveniles are constitutionally different than adults for purposes of sentencing." *Sweet*, 879 N.W.2d at 830.

Hall argues the constitutional protections set forth in the above-cited cases should be applied to young-adult offenders and that he should be eligible for parole. Specifically, in *Sweet*, the supreme court held "a sentence of life without the possibility of parole for a juvenile offender violates article I, section 17 of the Iowa Constitution." *Id.* at 839. While Hall acknowledges that *Sweet* applies only to juvenile offenders and that he was not a juvenile at the time of the offense, he contends the rationale underlying the case applies with equal force to him.

Within the existing legal framework, Hall's argument is compelling. Indeed, Justice Waterman set up this argument in his dissenting opinion in *Lyle*:

> By holding Lyle's seven-year mandatory minimum sentence for his violent felony is cruel and unusual punishment and unconstitutional under article I, section 17 of the Iowa Constitution, rather than under the Eighth Amendment, the majority evades review by the United States Supreme Court. As Justice Zager observes, no other appellate court in the country has gone this far. Our court stands alone in taking away the power of our elected legislators to require even a seven-year mandatory sentence for a violent felony committed by a seventeen-year-old.
> Will the majority stop here? Under the majority's reasoning, if the teen brain is still evolving, what about nineteen-year olds? If the brain is still maturing into the mid-20s, why not prohibit mandatory minimum sentences for any offender under age 26? As judges, we do not have a monopoly on wisdom. Our legislators raise teenagers too. Courts traditionally give broad deference to legislative sentencing policy judgments. Why not defer today?

854 N.W.2d at 405 (Waterman, J., dissenting) (citation omitted).

Although Hall's argument for the extension of the supreme court's juvenile sentencing scheme to young adult offenders is logical, the argument does not

entitle him to any relief. The supreme court has made clear that its juvenile sentencing decisions have "no application to sentencing laws affecting adult offenders." *Id.* at 403. "[T]he line between being a juvenile and an adult was drawn for cruel and unusual punishment purposes at eighteen years of age." *Seats*, 865 N.W.2d at 556-57. In addition, this court has rejected the same argument on numerous occasions. *See, e.g.*, *Nassif v. State*, No. 17-0762, 2018 WL 3301828, at *1 (Iowa Ct. App. July 5, 2018); *State v. Wise*, No. 17-1121, 2018 WL 2246861, at *3 (Iowa Ct. App. May 16, 2018); *Smith v. State*, No. 16-1711, 2017 WL 3283311, at *3 (Iowa Ct. App. Aug. 2, 2017); *Thomas v. State*, No. 16-0008, 2017 WL 2665104, at *2 (Iowa Ct. App. June 21, 2017); *Schultz v. State*, No. 16-0626, 2017 WL 1400874, at *1 (Iowa Ct. App. Apr. 19, 2017); *Kimpton v. State*, No. 15-2061, 2017 WL 108303, at *3 (Iowa Ct. App. Jan. 11, 2017); *State v. Davis*, No. 15-0015, 2015 WL 7075820, at *1-2 (Iowa Ct. App. Nov. 12, 2015) (collecting cases); *State v. Vance*, No. 15-0070, 2015 WL 4936328, at *2 (Iowa Ct. App. Aug. 19, 2015) (collecting cases); *State v. Clayton*, No. 13-1771, 2014 WL 5862075, at *6 (Iowa Ct. App. Nov. 13, 2014).

Hall also argues the failure to apply the supreme court's juvenile sentencing scheme to young adult offenders violates his right to equal protection of the laws under the Fourteenth Amendment to the Federal Constitution and article I, section 6 of the Iowa Constitution. *See Nguyen v. State*, 878 N.W.2d 744, 757 (Iowa 2016). To establish an entitlement to relief, Hall must establish he is similarly situated to a juvenile offender. *See State v. Kout*, 854 N.W.2d 706, 708 (Iowa Ct. App. 2014) ("A demonstration that people are similarly situated is a threshold test; failure to make this showing requires no further consideration of the alleged equal

protection violation." (citing *Varnum v. Brien*, 763 N.W.2d 862, 882 (Iowa 2009))).

Hall argues that young adults, like juveniles, have not completed their mental and emotional development. Young adults are thus similarly limited for constitutional purposes in their inability to assess risk and exercise self-control. *See Null*, 836 N.W.2d at 55 (noting the portion of the brain "central to 'executive functions,' such as reasoning, abstract thinking, planning, the anticipation of consequences, and impulse control" continues to develop into a person's early twenties).

As with his prior argument, Hall's argument may be compelling, but it is unavailing. Juveniles and young adults are not similarly situated for the purposes of sentencing within this constitutional scheme. The supreme court has explicitly stated "[juveniles] are constitutionally different from adults for purposes of sentencing." *Lyle*, 854 N.W.2d at 395 (quoting *Miller v. Alabama*, 567 U.S. 460, 471 (2012)); *accord Sweet*, 879 N.W.2d at 831 ("The qualities that distinguish juveniles from adults do not disappear when an individual turns eighteen, but society has generally drawn the line at eighteen for the purposes of distinguishing juveniles from adults."); *see also Harrison*, 914 N.W.2d at 188-202. The constitutional distinction is based on the long-accepted legal distinction between juveniles and adults. For example, persons eighteen years and older are also afforded more rights than juveniles, including: the right to serve as a fiduciary; marry absent parental and judicial consent; vote; sit on a jury; get a tattoo; or use tobacco products. *See Null*, 836 N.W.2d at 53.

Whatever the merits of the distinction, the supreme court has made and justified the distinction. *See Lyle*, 854 N.W.2d at 403 ("Lines are drawn in our law by necessity and are incorporated into the jurisprudence we have developed to

usher the Iowa Constitution through time."). Ours is not to question why. *State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014) ("We are not at liberty to overrule controlling supreme court precedent."). We thus decline the invitation to extend the supreme court's juvenile sentencing scheme to young-adult offenders. *See Spencer v. Philipp*, No. 13-1887, 2014 WL 4230223, at *2 (Iowa Ct. App. Aug. 27, 2014) ("As a general rule, the task of materially altering substantive or procedural rights is best left to the General Assembly or the Supreme Court of Iowa.").

For these reasons, we do not find Hall's sentence to be unconstitutional.

### C. Pro Se Claims.

Finally, Hall submitted a pro se "brief" setting out four statements alleging errors without further discussion. Insofar as his claims were preserved for our review, we have considered them and determined they are without merit.

### III. Conclusion.

Substantial evidence exists to support the jury's verdict, and the district court properly denied Hall's motion for judgment of acquittal. Additionally, Hall's sentence of life without parole is not cruel and unusual punishment or in violation of his right to equal protection of the laws. Finally, his pro se arguments, insofar as they were preserved for our review, are without merit. Accordingly, we affirm Hall's judgment and sentence following his convictions of first-degree murder and first-degree robbery.

**AFFIRMED.**