# IN THE SUPREME COURT OF IOWA

No. 15–0175

Filed June 16, 2017

Amended August 17, 2017

**STATE OF IOWA,**

> Appellee,

vs.

**CHRISTOPHER RYAN LEE ROBY,**

> Appellant.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, Stephen C. Clarke, Judge.

Christopher Ryan Lee Roby challenges the district court's imposition of a minimum term of incarceration without the possibility of parole following a resentencing hearing in which the district court was to consider certain mitigating factors attributable to his youth at the time of the offense. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.**

John Audlehelm of Audlehelm Law Office, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee.

**CADY, Chief Justice.**

In this appeal, we must decide if article I, section 17 of the Iowa Constitution categorically prohibits any minimum term of incarceration without the possibility of parole when imposed on an individual who was a juvenile at the time of the offense. If it does not, we must also decide whether the district court erred in resentencing Christopher Roby to a minimum term of incarceration following a hearing in which the court was to consider certain mitigating factors attributable to his youth at the time of the offense. In December of 2004, a jury found Roby guilty of two counts of sexual abuse for his conduct when he was sixteen and seventeen years of age. The court initially sentenced him, as required by statute, to twenty-five years with a mandatory minimum of seventeen and one-half years for sexual abuse in the second degree and a concurrent term of ten years for sexual abuse in the third degree. Following our decision in *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014), in which we held all statutorily imposed mandatory minimums constituted cruel and unusual punishment under the Iowa Constitution, the district court held a resentencing hearing to determine whether the minimum term of incarceration should be imposed. It found it should and issued an order detailing its reasoning. Roby appealed, arguing any minimum term of incarceration without the possibility of parole is unconstitutional and, in the alternative, that the district court failed to properly apply the factors we identified in *Lyle*. The court of appeals disagreed with Roby on both matters and affirmed the sentence. We granted further review. On further review, we find the Iowa Constitution does not prohibit a district court from sentencing a juvenile offender to a minimum term of incarceration without the possibility of parole, but we remand for resentencing.

## I. Factual Background and Proceedings.

Christopher Roby was convicted following a jury trial of the crimes of sexual abuse in the second and third degrees on December 2, 2004. He was sixteen and seventeen when he committed the crimes. The conviction resulted from Roby's inappropriate sexual conduct with S.M., who was ages eleven through thirteen during the relevant times.

**A. The Offenses.** The first incident, for which Roby was not prosecuted, but the jury did hear evidence on, was apparently in the spring of 1998. Roby was staying at S.M.'s house. S.M.'s parents were downstairs, while S.M. and her siblings, along with Roby, were upstairs. This was not unusual. Roby was S.M.'s brother's best friend since kindergarten and would often stay overnight. He was considered a member of the family and would even accompany them on vacations and to church. S.M., then ten years old, fell asleep in her parents' bedroom while watching television. She awoke to Roby, then fifteen, forcing his hand under her pants and underwear. She immediately left the room, went downstairs, and told her parents what had occurred. S.M.'s parents were furious and confronted Roby, who left the house with S.M.'s brother, and the two walked to a gas station before Roby went home to his own parents. S.M.'s parents did not contact the police or Roby's parents at that time.

After about six to eight weeks, S.M.'s parents allowed Roby back into the home. They insisted Roby not be left alone with S.M. Over time, however, this precaution eased. Years passed with Roby frequently coming and going and staying over, just as he was before the initial incident. In March of 2002, Roby, now eighteen, left for the Navy. In September of 2002, he returned on leave. That was when S.M., now fourteen, confided in her brother's girlfriend that Roby had been abusing

her ever since being let back into the house. S.M. stated the abuse would occur nearly every time Roby had stayed over during the preceding three years and that it occurred again with Roby back on leave. Either Roby would touch S.M.'s genitals and breasts or he would force S.M. to masturbate him. This contact with S.M. was always nonconsensual and was severely impacting her mental health. S.M.'s parents learned of the abuse, and S.M.'s mother confronted Roby. Roby denied any contact occurred. S.M.'s mother then went to the police.

The police arrested Roby. There is some indication Roby initially thought the police were investigating him for stealing a video game or maybe thought admitting that crime would deflect them from investigating the abuse. During an interrogation, Roby confessed to the contact. However, the court ultimately suppressed the interrogation because Roby only confessed after the investigator implied he must submit to a polygraph for use in court, promised him leniency, and threatened greater punishment if he continued to deny the allegations.

After the interrogation, Roby was charged and released on bond to return to the Navy. He served for two years until being discharged to answer for this case. The prosecutor had initially charged Roby with one count of sexual abuse in the third degree for the alleged conduct while Roby was eighteen and S.M. was under fourteen. After a breakdown in plea negotiations, the prosecutor charged Roby with four counts, delineated by Roby and S.M.'s birthdays: (Count I) sexual abuse in the second degree for conduct occurring when S.M. was under twelve and Roby was fifteen or sixteen, (Count II) sexual abuse in the third degree for conduct occurring when S.M. was under fourteen and Roby was under eighteen, (Count III) sexual abuse in the third degree for conduct occurring when S.M. was under fourteen and Roby was eighteen, and

(Count IV) sexual abuse in the third degree for conduct occurring when S.M. was fourteen and Roby was eighteen. After Roby moved to dismiss Count I for alleging conduct while Roby was fifteen and therefore under the jurisdiction of the juvenile court, the prosecutor amended Count I a second time and confined it to the time after Roby turned sixteen. Thus, while the jury heard evidence regarding the initial incident when S.M. told her parents Roby was touching her while she was sleeping, he was not charged for this event. Instead, he was charged based on S.M.'s statements of continuing abuse from that point.

At trial, the State presented testimony from S.M., her parents, and her brother. Roby did not testify. He also did not present witnesses. The jury found Roby guilty of Counts I and II. They found him guilty of sexual abuse occurring when Roby was sixteen and S.M. was eleven, and when Roby was seventeen and S.M. was twelve or thirteen years old. The jury found Roby not guilty of Counts III and IV, abuse occurring after he turned eighteen.

**B. Initial Sentencing.** A presentence investigation (PSI) report was prepared, and the court held a sentencing hearing with testimony from Roby and his parents. Though the record is limited on Roby's life before prison, at least some history appears from trial testimony, this hearing, and the PSI. The record shows Roby was born two months premature on December 20, 1983. His mother indicated his biological father abducted, abused, and neglected him for four years when he was very young. Roby's father eventually returned him to his mother in Waterloo, who later married a man who adopted Roby. Roby's mother was a homemaker and his adoptive father worked for a farm implement company as a designer. Roby is the middle child of three. He maintained a good relationship with his family, despite the absence of his

biological father, but generally felt his childhood was "rough." He was diagnosed with attention-deficit disorder. He completed the tenth grade at Expo Alternative Learning Center in Waterloo and reported getting along well with his teachers, although he was suspended once for fighting. Roby joined the Navy to, in his words, straighten out his life. The PSI reported Roby frequently consumed alcohol while in the Navy and used marijuana. At sentencing, Roby denied any alcohol or drug use. Roby had no juvenile record before this case.

Roby's mother testified,

> It just seems like it's been one thing after another with this kid. . . . This kid has tried and tried and tried to get his life on track, and it seems like every time he does, it's one thing after another waitin' there to knock him back down. And now you're going to take him away from me for 25 years or whatever, and I just—I think it's ridiculous.

Roby's adoptive father testified,

> I think the penalty for the crime far outweighs the crime. It's absurd and it's even more absurd that the judge is not allowed to make any adjustments to that. I don't think you can take things like that away from the judges. Second-degree sexual abuse, you can't lump all of them into one. Chris was a minor when it happened. And like what he did get a little therapy, you don't put them in jail for 25 years. That's not going to solve anything.

Roby also testified. He maintained his innocence and stated, "There's just so many inconsistencies in her story, and I mean, I just—I don't see how one person can—can take another person's life like this."

The court sentenced Roby, stating, "The court is sympathetic to the feelings of the family, however, as they point out, this is the only disposition available to the court under the law[] as it presently stands." The court was statutorily required to, and did, impose the maximum sentence of twenty-five years on Count I with a mandatory minimum of seventeen and one-half years before eligibility for parole. The court

imposed a concurrent sentence of ten years for Count II. This was in January of 2005. Roby had recently turned twenty-one while in jail awaiting sentencing.

**C. Resentencing.** In 2014, following this court's holdings in *State v. Null*, 836 N.W.2d 41 (Iowa 2013), *State v. Pearson*, 836 N.W.2d 88 (Iowa 2013), and *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013), Roby, who was thirty years old, moved to correct an illegal sentence. He argued he was entitled to an individualized review under the principles of those cases. Around the same time, we issued our opinion in *Lyle* and confirmed juveniles like Roby were entitled to individualized review of their statutorily imposed sentences. 854 N.W.2d at 404. Pursuant to these opinions, the court held a resentencing hearing to correct the statutorily mandated minimum sentence of seventeen and one-half years using the five factors identified in *Lyle*:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Id.* at 404 n.10 (quoting *Miller v. Alabama*, 567 U.S. 460, 477–78, 132 S. Ct. 2455, 2468 (2012)). On "considering all the relevant factors and facts of the case," the district court had to either "resentence [Roby] by imposing a condition that [Roby] be eligible for parole" or, "[i]f the mandatory minimum period of incarceration is warranted, . . . impose the sentence provided for under the statute, as previously imposed." *Id.*

Roby presented his prison disciplinary and other prison treatment records. This was the only exhibit. Roby's counsel addressed the *Lyle*

factors by first noting Roby was kicked out of his parents' home, indicating a lack of familial support. Roby's counsel continued, noting Roby had no prior criminal record. She argued Roby had difficulties navigating the criminal justice system as indicated by the interrogation the court ultimately had to suppress. She noted he served two years in the Navy. She argued he had the potential to be rehabilitated based on his prison disciplinary records, which showed most of his violations occurred early on in his incarceration. She also noted he had obtained his GED, taken a college course, been a lead person in the science shop, worked in the kitchen, and tutored other inmates. Finally, Roby's counsel pointed out that Roby had family in Waterloo willing to assist him on release.

The State countered that Roby's disciplinary records did not indicate rehabilitation potential because they included an infraction for inappropriately touching female staff. The State also pointed to Roby's failure to obtain sex-offender treatment, which Roby's counsel argued was due to department of corrections backlog and policy not to treat offenders until they are nearing release. The State also argued Roby continued to deny responsibility and blame the victim based on statements he made while being treated for anxiety and sleeplessness. The State concluded as to the first *Lyle* factor, "It would cut against him because of the multiple acts that were involved in this case." The State continued its arguments on the *Lyle* factors, noting Roby's home environment was the same as the victim's. As to the circumstances of the crime, the State noted Roby's actions were not sexual exploration, but abuse. As to navigating the criminal process, the State noted Roby had to be taken from the Navy and that he exercised his rights to have the interrogation suppressed. As to rehabilitation, the State again

argued Roby failed to take responsibility, as shown by his numerous posttrial appeals and motions.

Roby testified on his own behalf, stating,

> Your Honor, over the last ten years, I've tried to better myself while I was in there. I was told when I was getting my GED, one of the teachers told me that if you fail to plan, you plan to fail. So everything I've done since I've been in there has been to make it so I'll be a better person when I get out, Your Honor. I've gotten my GED. I've taken any courses that's been available to me. I've learned job skills. I've learned trades. I've helped other people bettering themselves, teaching them how to do a cover letter, a resume, how to use a computer.
>
> I'm sorry for all of this, Your Honor. I just—I hope that after ten years I can get my life back.

Approximately a month later, the court issued its ruling.

As to the first *Lyle* factor, the court found,

> The acts that resulted in the jury's guilty verdicts were not merely based on the defendant's immaturity, impetuosity and failure to appreciate the risks and consequences. In this case this defendant had been confronted at an earlier time about improper touching of this victim. Notwithstanding that, the defendant continued to sexually abuse his victim.

As to the second factor,

> While the defendant's family and home environment were obviously not the best, the victim's family attempted to step in and provide a home for him. It was during this time that the defendant took advantage of the child victim.

For the third,

> The defendant's participation in the conduct that resulted in his conviction was not the result of any familial or peer pressure. It was conduct freely chosen by the defendant with no care at all for the victim and less care for the victim's family that was giving him a home.

The court did not address the fourth factor, but noted as to the fifth,

> While the court may have been hopeful that a period of incarceration would have led the defendant to some remorse for his behavior, it is apparent that this is not the case. The

documents submitted as Defendant's exhibit 1 show that in an evaluation conducted in May of 2005 at the Iowa Medication and Classification Center the defendant again denied any sexual contact ever occurring with the victim. In a note entitled "Psychological Encounter" showing an encounter date of October 12, 2012, while explaining his sleep problems, it was reported, "He noted that he does not understand how his case has not been overturned because he was not in Iowa at the time of the crime."

The victim stance taken by the defendant does not bode well for rehabilitation. After 10 years the defendant has yet to confront his own behavior or even begin to be able to empathize with the victim of his acts.

Thus, the court found a mandatory minimum sentence was appropriate. Roby appealed, and the court of appeals affirmed. We granted further review to address Roby's two arguments: (1) that the Iowa Constitution categorically prohibits all minimum terms of incarceration without the possibility of parole when imposed on juveniles, and in the alternative, (2) that the district court erred in its analysis of the *Lyle* factors.

## II. Standard of Review.

We review a constitutional challenge to a sentence de novo. *See State v. Sweet*, 879 N.W.2d 811, 816 (Iowa 2016). Roby's first argument is a categorical one, and therefore, we apply de novo review. *See, e.g., id.* at 816–17; *see also Lyle*, 854 N.W.2d at 382–83. However, the parties dispute the appropriate standard of review on Roby's second challenge, and we have not yet established the standard of review for appeals following a juvenile's resentencing hearing.

As we recently noted in *State v. Seats*, "We have expressed three different standards of review when a defendant challenges his or her sentence on appeal." 865 N.W.2d 545, 552 (Iowa 2015). We review for an "abuse of discretion," our most deferential standard, "if the sentence is within the statutory limits." *Id.* We review for "correction of errors at

law," an intermediate standard, "when the defendant challenges the legality of a sentence on nonconstitutional grounds." *Id.* at 553. Finally, we apply de novo review, our least deferential standard, to constitutional challenges. *Id.*

Roby reasons the individualized hearing requirement is constitutional in origin, and therefore, an appeal from such a hearing is on constitutional grounds subject to de novo review. The State argues the sentence imposed is within the statutory limits, and therefore, our review is for an abuse of discretion. The court of appeals in this case reviewed Roby's resentencing hearing for an abuse of discretion. We affirm this approach, but would elaborate on the use of the abuse-of-discretion standard in the juvenile sentencing context.

We begin by noting an unconstitutional sentence remains unconstitutional even if the district court held a hearing before imposing it. *See Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016) ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.'" (quoting *Miller*, 567 U.S. at 478–80, 132 S. Ct. at 2469)). However, we have not yet categorically declared all minimum sentences of incarceration unconstitutional when imposed on juvenile offenders. *See Lyle*, 854 N.W.2d at 403 ("[T]he holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed . . . ."). Instead, we have held it is the "absence of a sentencing procedure" that offends article I, section 17 of the Iowa Constitution. *Id.* at 402. Thus, when there is an appropriate sentencing procedure there is no constitutional violation. Under our existing law, if the district court follows the

sentencing procedure we have identified and a statute authorizes the sentence ultimately imposed, then our review is for abuse of discretion; we ask whether there is "evidence [that] supports the sentence." *Seats*, 865 N.W.2d at 553.

However, we agree with a recent decision from a Michigan appellate court that "the abuse-of-discretion standard requires further explanation in this context." *See People v. Hyatt*, 891 N.W.2d 549, 576 (Mich. Ct. App. 2016). Although the Michigan court was reviewing the imposition of a sentence of life without parole, we find the special considerations involved in sentencing a juvenile offender to an adult sentence similarly mean that, "even under this deferential standard, an appellate court should view such a sentence as inherently suspect," and "cannot merely rubber-stamp the trial court's sentencing decision." *Id.* at 577–78. We too import this guidance from the Eighth Circuit:

> A discretionary sentencing ruling, similarly, may be [an abuse of discretion] if a sentencing court fails to consider a relevant factor that should have received significant weight, gives significant weight to an improper or irrelevant factor, or considers only appropriate factors but nevertheless commits a clear error of judgment by arriving at a sentence that lies outside the limited range of choice dictated by the facts of the case.

*Id.* at 578 (alteration in original) (quoting *United States v. Haack*, 403 F.3d 997, 1004 (8th Cir. 2005)). In sum, while the review is for abuse of discretion, it is not forgiving of a deficiency in the constitutional right to a reasoned sentencing decision based on a proper hearing.

### III. The Categorical Challenge.

Like the United States Supreme Court, we address a categorical constitutional challenge to a sentencing practice by using a two-step analysis. *See Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 2022 (2010); *Roper v. Simmons*, 543 U.S. 551, 564, 125 S. Ct. 1183, 1192

(2005); *Sweet,* 879 N.W.2d at 835; *Lyle,* 854 N.W.2d at 386. Under this analysis, we first "look to whether there is a consensus, or at least an emerging consensus," to guide our consideration of the question. *Sweet,* 879 N.W.2d at 835. "Second, we exercise our independent judgment" to decide the question. *Id.* In this case, the question is whether a twenty-five-year sentence with a minimum period of incarceration of seventeen and one-half years for a juvenile offender convicted of sexual abuse is categorically prohibited under the cruel and unusual punishment clause of the Iowa Constitution. In other words, the question is whether our constitution requires all juvenile offenders be immediately eligible for parole.

**A. Evidence of Consensus.** We recognize the presence or absence of a national consensus is normally indicated by the actions of legislatures. *See, e.g., Graham,* 560 U.S. at 61, 130 S. Ct. at 2022 ("The Court first considers 'objective indicia of society's standards, as expressed in legislative enactments and state practice,' to determine whether there is a national consensus against the sentencing practice at issue." (quoting *Roper,* 543 U.S. at 563, 125 S. Ct. at 1191)).

When we decided *Lyle,* we noted some states had already "limited or abolished mandatory minimums for juveniles." 854 N.W.2d at 386 n.3 (compiling statutes). Since then, state legislatures have continued to reform their state's juvenile justice systems. For example, many jurisdictions have reconsidered "the more sweeping question of whether too many juveniles are being tried in 'adult' court."[1] Brief of the

---

[1]*See, e.g.*, Cal. Penal Code § 1170.17(b)(2)(A)–(E) (West, Westlaw current through ch. 9 of 2017 Reg. Sess.); Colo. Rev. Stat. Ann. § 19-2-517(1)–(3), (6)–(10) (West, Westlaw current through Laws effective April 28, 2017); Ind. Code Ann. § 31-30-1-4(c) (West, Westlaw current through 2017 First Reg. Sess.).

Charles Hamilton Houston Inst. for Race & Justice and Criminal Justice Inst. as Amici Curiae in Support of Neither Party, *Montgomery*, ___ U.S. ___, 136 S. Ct. 718 (No. 14–280), 2015 WL 4624172, at *11. Others have shortened the minimum term of incarceration juveniles must serve before parole eligibility.[2] Still others are working to improve juvenile justice by providing safer facilities[3] and greater access to rehabilitative programs.[4] All the foregoing tells us juvenile justice is undergoing significant and comprehensive reform. However, it also tells us that, in this time of feverish legislative action, no legislature has chosen to require a *Miller*-type hearing before imposing any minimum term of incarceration, and no legislature has chosen to make all juvenile offenders immediately eligible for parole.

Yet, we may broaden our inquiry to consider rapid changes in constitutional protections. *See Lyle*, 854 N.W.2d at 387. The State of Iowa was the first to prohibit sentencing juveniles to statutorily imposed mandatory minimums. *See id.* at 386 (noting no court has constitutionally prohibited the practice, and most states permit or require minimum sentences). We are aware of one state supreme court that has since held similarly. *See State v. Houston-Sconiers*, 391 P.3d 409, 420 (Wash. 2017) ("In accordance with *Miller*, we hold that

---

[2]*See, e.g.*, Cal. Penal Code § 3051(b)(1)–(3) (West, Westlaw current through ch. 9 of 2017 Reg. Sess.); Conn. Gen. Stat. Ann. § 54-125a(f)(1) (West, Westlaw current through May 31, 2017); Del. Code Ann. tit. 11, § 4204A(d)(1) (West, Westlaw current through 81 Laws 2017, chs. 1–15); Nev. Rev. Stat. Ann. § 213.12135(1)(a)–(b) (West, Westlaw current through 79th Reg. Sess. 2017); W. Va. Code Ann. § 61-11-23(b) (West, Westlaw current with 2017 Reg. Sess. through March 14, 2017).

[3]*See, e.g.*, Conn. Gen. Stat. Ann. § 17a-22bb(f)–(g) (West, Westlaw current through May 31, 2017); Kan. Stat. Ann. § 75-7023(d)–(f) (West, Westlaw current through May 18, 2017).

[4]*See, e.g.*, Mich. Comp. Laws Ann. § 791.262d(3)(a)–(b) (West, Westlaw current through No. 42 of the 2017 Reg. Sess.).

sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of *any* juvenile defendant . . . ." (Emphasis added.)). We also note courts are still in the midst of defining the new system of individualized hearings, with little uniformity emerging as to either when the hearing is required and what it should look like. *Compare Landrum v. State*, 192 So. 3d 459, 467 (Fla. 2016) (concluding a *Miller*-type hearing is required before a sentencing court may impose a discretionary sentence of life without parole), *with Foster v. State*, 754 S.E.2d 33, 37 (Ga. 2014) (finding *Miller*-type hearing inapplicable to discretionary sentence of life without parole). *Compare Casiano v. Comm'r of Corr.*, 115 A.3d 1031, 1044 (Conn. 2015) (concluding *Miller* applies to juvenile offenders sentenced to the "functional equivalent" of life without parole), *with State v. Ali*, 895 N.W.2d 237, 237–38 (Minn. 2017) (holding *Miller* only applies to the specific sentence of life without parole). *Compare State v. Charles*, 892 N.W.2d 915, 922–23 (S.D. 2017) (finding a resentencing hearing satisfied the standard announced in *Miller*), *with People v. Berg*, 202 Cal. Rptr. 3d 786, 795 (Ct. App. 2016) (finding a resentencing hearing failed to satisfy *Miller*). The Supreme Court has intervened only to say that parole eligibility is the simplest way to cure an otherwise constitutionally impermissible juvenile sentence. *See Montgomery*, 577 U.S. at \_\_\_, 136 S. Ct. at 736. In all, we can foresee these challenges will continue, with frequency, for some time before the Constitution's role in sentencing juveniles is clarified.

We may also consider changes in professional opinion and scholarly commentary in finding consensus. *See Sweet*, 879 N.W.2d at 835–36. Many academics appear comfortable with the idea of either individualized sentencing or "a system of minimum sentences for juvenile offenders that are shorter in duration than those imposed on their adult

counterparts." Elizabeth Scott et al., *Juvenile Sentencing Reform in a Constitutional Framework*, 88 Temp. L. Rev. 675, 708 (2016) [hereinafter Scott]. But others assert the time has come to refocus on rehabilitative efforts, with a heavy emphasis on the availability of parole. *See* Martin Gardner, *Youthful Offenders and the Eighth Amendment Right to Rehabilitation: Limitations on the Punishment of Juveniles*, 83 Tenn. L. Rev. 455, 495 (2016) ("Rather than either parole release or individualized presentencing hearings, the best reading of *Roper/Graham/Miller* requires both."). As one commentator explains,

> Given the Court's acknowledgment of the pre-sentence impossibility of precisely distinguishing those juveniles whose crimes are one-time products of "transient immaturity" and those "rare [offenders] whose crime[s] reflect irreparable corruption," rehabilitation programs within prison with parole release are necessary to effectuate a youthful offender's right to a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Moreover, because rehabilitation can occur at any time and requires immediate release from prison upon its occurrence, it follows that mandatory minimum sentences can no longer be imposed on juvenile offenders if *Graham* is followed to its logical conclusions.

*Id.* at 495–96 (alterations in original) (footnotes omitted) (quoting *Graham*, 560 U.S. at 68, 75, 130 S. Ct. at 2026, 2030). In addition, the American Law Institute (ALI), in section 6.11A of its *Model Penal Code: Sentencing*, proposes the court must always have the "authority to impose a sentence that deviates from any mandatory-minimum term of imprisonment under state law," in keeping with its "categorical disapproval" of mandatory penalty provisions. *See* Model Penal Code: Sentencing § 6.11A(f) & cmt. *f*, at 36, 43 (Am. Law Inst., Tentative Draft No. 2, 2011). This section was approved in 2011, one year prior to the Supreme Court's guidance in *Miller*. *See* Model Penal Code: Sentencing at xii (Am. Law Inst., Tentative Draft No. 4, 2016). Even then, the ALI

recognized the lessened blameworthiness of juvenile offenders, their potential for rehabilitation, and the lack of "persuasive empirical support for the proposition that increased punishment severity acts as an effective deterrent of criminal acts." Model Penal Code: Sentencing § 6.11A cmt. *c*(5), at 41 (Am. Law Inst., Tentative Draft No. 2, 2011). The ALI did not, however, discuss parole availability, aside from noting the then-recent *Graham* case. *See id.* at 44.

Finally, we consider the actions of our own legislature in determining consensus. *See Lyle*, 854 N.W.2d at 388. The Iowa legislature has recently adopted statutes that permit the sentencing court to depart from statutory minimums. *See* 2015 Iowa Acts ch. 65, § 1 (now codified at Iowa Code § 902.1(2)(*a*)(2) (2017)) (authorizing the court to sentence a juvenile convicted of a class "A" felony to "life with the possibility of parole after serving a minimum term of confinement as determined by the court"); 2013 Iowa Acts ch. 42, § 14 (now codified at Iowa Code § 901.5(14)) ("Notwithstanding any provision . . . prescribing a mandatory minimum sentence for the offense, if the defendant . . . was under the age of eighteen at the time the offense was committed, the court may suspend the sentence in whole or in part, including any mandatory minimum sentence . . . ."). We give substantial "deference to the legislature when it expands the discretion of the court in juvenile sentencing" because it "can be 'the most reliable objective indicator[] of community standards for purposes of determining whether a punishment is cruel and unusual.'" *Lyle*, 854 N.W.2d at 388 (quoting *State v. Bruegger*, 773 N.W.2d 862, 873 (Iowa 2009)). We find "the Code in general is replete with provisions vesting considerable discretion in courts to take action for the best interests of the child." *Id.* at 388–89 (citing as examples Iowa Code section 92.13; section 232C.3(1), and

section 282.18(5)). We can infer from these latest legislative developments that the Iowa legislature has embraced the notion of court discretion when initially sentencing juveniles. To contrast, there is no indication the Iowa legislature would forbid the court from imposing a minimum sentence.

In all, no national or community consensus readily emerges to support Roby's claim. This "gives us pause." *Sweet*, 879 N.W.2d at 836. In *Roper*, the Court observed "even in the 20 States without a formal prohibition on executing juveniles, the practice is infrequent." *Roper*, 543 U.S. at 564, 125 S. Ct. at 1192. The rate of legislative change, too, was significant. *Id.* at 565, 125 S. Ct. at 1193. Similarly, in *Graham*, the Court found the ability to impose life without parole on juveniles existed widely, but was seldom used except in certain jurisdictions. *See Graham*, 560 U.S. at 62–64, 130 S. Ct. at 2023–24. After *Graham*, many states acted to forbid the practice. *See Sweet*, 879 N.W.2d at 835. In contrast, apparently every state permits a minimum sentence. Moreover, the growing body of constitutional challenges and professional criticism is still being tested. And finally, our legislature has recently reauthorized minimum sentences at the discretion of the sentencing court. This all shows us the individualized hearing process is still being defined, and it will likely not be the last reform.

**B. Independent Judgment.** Since consensus is not dispositive of our inquiry, we turn to our own independent judgment. *See id.* at 836. By that, we mean we carefully consider if available information and evidence would support the categorical elimination of the practice of sentencing juvenile offenders to a minimum prison term with no opportunity for parole. It is our duty to use this type of consideration, as "Iowans have generally enjoyed a greater degree of liberty and equality

because we do not rely on a national consensus regarding fundamental rights without also examining any new understanding." *Lyle*, 854 N.W.2d at 387. To this, we note the "watershed"-like change in juvenile justice over the last decade is not complete. *Id.* at 390; Cara H. Drinan, *The* Miller *Revolution,* 101 Iowa L. Rev. 1787, 1825 (2016) [hereinafter Drinan] (addressing "three areas ripe for reform in the wake of *Miller*: (1) juvenile transfer laws; (2) presumptive sentencing guidelines as they apply to children; and (3) juvenile conditions of confinement"). In many ways, we are still understanding how brain science can make our juvenile justice system better. However, the State argues the opportunity to be eligible for parole provides the needed bulwark against overly harsh mandatory minimum sentences, and we have reached this particular watershed's common outlet. We turn to our body of cases to see if more can be found to support Roby's categorical argument.

In *Lyle*, we found our constitution prohibited statutorily imposed mandatory minimums. *See Lyle*, 854 N.W.2d at 404. Our reasoning began with twin principles: (1) Juveniles have diminished culpability, and (2) penological justifications are less applicable to them. *Id.* at 393–94. We look to see if these principles also prohibit judicially imposed minimum sentences. We find the first is equally applicable to every juvenile, whether subjected to a statutorily or judicially imposed minimum sentence. Juveniles "are not fully equipped to make 'important, affirmative choices with potentially serious consequences.' " *Id.* at 397 (quoting *Bellotti v. Baird,* 443 U.S. 622, 635, 99 S. Ct. 3035, 3044 (1979)). They lack maturity and the ability to make reasoned decisions, they are susceptible to outside influence, and they will likely change. *See Roper*, 543 U.S. at 569–70, 125 S. Ct. at 1195. As noted in *Miller* and *Lyle,* nothing about this is crime or punishment specific.

*Miller*, 567 U.S. at \_\_\_, 132 S. Ct. at 2465; *Lyle*, 854 N.W.2d at 399. Therefore, whether the punishment is handed down by the legislature or the court, a juvenile's diminished culpability means it risks being excessive.

The second principle, diminished penological justifications, is less compelling when a court is given discretion to impose a minimum sentence. For example, statutorily imposed mandatory minimums are not appropriate retribution because "attempting to mete out a given punishment to a juvenile for retributive purposes irrespective of an individualized analysis of the juvenile's categorically diminished culpability is an irrational exercise." *Lyle*, 854 N.W.2d at 399. But judicially imposed mandatory minimums only follow a hearing on "the culpability of the offender in addition to the harm the offender caused." *Id.* at 398. Thus, it may be appropriate retribution to incarcerate a juvenile for a short time without the possibility of parole. Additionally, a sentencing judge could properly conclude a short term of guaranteed incarceration is necessary to protect the public.

On the other hand, although we used the phrase "statutorily mandated," we have recognized incarceration "[a]fter the juvenile's transient impetuosity ebbs and the juvenile matures and reforms . . . becomes 'nothing more than the purposeless and needless imposition of pain and suffering.'" *Id.* at 400 (quoting *Coker v. Georgia*, 433 U.S. 584, 592, 97 S. Ct. 2861, 2866 (1977)). Therefore, even a judicially imposed minimum may quickly exceed the sentence necessary to punish the juvenile offender. Additionally, the justification of deterrence will normally be irrelevant to all juveniles. *See id.* at 399 ("If a juvenile will not engage in the kind of cost-benefit analysis involving the death penalty that may deter them from committing a crime, there is no reason

to believe a comparatively minor sentence of a term of years subject to a mandatory minimum will do so.").

Finally, we note all minimum sentences tend to obstruct rehabilitation. Studies show incarcerating juveniles increases the risk of recidivism by depriving the juvenile of positive influences during a crucial time for development. *See id.* at 400 ("Juvenile offenders who are placed in prison at a formative time in their growth and formation can be exposed to a life that can increase the likelihood of recidivism." (Citation omitted.)). Perhaps the initial shock of incarceration may scare some juveniles "straight," but the damaging effects of the prison environment on juvenile development are well documented and severe. *See, e.g.,* Katherine Hunt Federle, *The Right to Redemption: Juvenile Dispositions and Sentences*, 77 La. L. Rev. 47, 59–64 (2016) (identifying increased recidivism, higher rates of abuse and health problems, reduced opportunities, and delayed maturation as collateral consequences of incarcerating juvenile offenders). This is true of all juveniles held with minimum sentences and is likely made worse by apparent Iowa Department of Corrections policy leaving them ineligible for rehabilitative treatment until they near their discharge date.

Thus, "[i]f rehabilitation were the sole proper goal, it would follow that all sentences for juveniles should come with immediate parole eligibility." *Seats*, 865 N.W.2d at 580–81 (Mansfield, J., dissenting). This has not been the approach since the progressive reformers of the late nineteenth century. *See Lyle*, 854 N.W.2d at 390 ("To ameliorate the harshness and inequity of trying children in adult courts . . . , reformers advocated for the establishment of a system less concerned with ascertaining the child's guilt or innocence and more concerned with determining what was in the child's best interests based upon the child's

unique circumstances."); *see also Null*, 836 N.W.2d at 52 (noting juvenile courts were originally intended to "promote the welfare of juvenile offenders"). While many may believe it is time for a complete restructuring of the juvenile justice system to return us to that understanding, we have never indicated such a change was constitutionally mandated.

Instead, we repeatedly limited our holding in *Lyle* to statutorily imposed minimums. We stated expressly,

> It is important to be mindful that the holding in this case does not prohibit judges from sentencing juveniles to prison for the length of time identified by the legislature for the crime committed, nor does it prohibit the legislature from imposing a minimum time that youthful offenders must serve in prison before being eligible for parole. Article I, section 17 only prohibits the one-size-fits-all mandatory sentencing for juveniles. Our constitution demands that we do better for youthful offenders—all youthful offenders, not just those who commit the most serious crimes. Some juveniles will deserve mandatory minimum imprisonment, but others may not. A statute that sends all juvenile offenders to prison for a minimum period of time under all circumstances simply cannot satisfy the standards of decency and fairness embedded in article I, section 17 of the Iowa Constitution.

*Lyle*, 854 N.W.2d at 403. We expressly authorized our judges to "sentence those juvenile offenders to the maximum sentence if warranted and to a lesser sentence providing for parole if warranted." *Id.* at 404. In fact, "[i]f the mandatory minimum period of incarceration is warranted," we commanded them to impose the sentence. *See id.* at 404 n.10.

In sum, applying the two-step inquiry we use for categorical challenges, we can conclude, at this time, (1) there is no national or community consensus against imposing minimum terms of incarceration without the possibility of parole on juveniles, provided they have the opportunity to appear before a neutral decision-maker for an

individualized review; and (2) in our independent judgment article I, section 17 does not yet require abolition of the practice.

**C. Practical Difficulties.** Notwithstanding, Roby argues the practical difficulties in applying the *Lyle* factors are so substantial that we should abandon the practice in favor of a categorical prohibition that would require immediate eligibility for parole. He also points to the efficacy of the parole board and the procedural difficulties of challenging the action or inaction of the parole board.

The linchpin of the constitutional protection provided to juveniles is individualized sentencing. We have on numerous occasions discussed the nature of this sentencing and the role of the court in imposing the sentence. *See, e.g., Seats,* 865 N.W.2d at 555–56 (majority opinion); *Lyle,* 854 N.W.2d at 404 n.10; *Null,* 836 N.W.2d at 74–75. We endorse the five factors identified in *Miller* as guideposts for courts to follow. *Lyle,* 854 N.W.2d at 404 n.10. Yet, as this case and others illustrate, difficulties in applying the factors are obvious. *See Sweet,* 879 N.W.2d at 838.

Nevertheless, we are not prepared to conclude that practice has proven the five factors to be unworkable. Instead, the difficulties in applying the factors are a call for clearer guidance to permit them to supply the required protection demanded by our constitution. This observation is not a criticism in any way, but a recognition that justice advances in steps.

The five factors were drawn from the reasons that created the fundamental constitutional proposition that harsh criminal sentences are no longer appropriate for juvenile offenders. They are woven from the growing body of scientific research and represent our current and best understanding of the distinct features of human development. Our laws

have always sought to give special consideration to youth. Our ability to integrate this consideration into the law simply gets better over time as our understanding improves. The change that results from this understanding is what a justice system gives a democracy when it is doing its job under the Constitution. It is what the Supreme Court did fifty years ago in *In re Gault* when it changed the historic approach to dealing with juvenile offenders and recognized that youthful offenders are constitutionally entitled to the same type of procedural protections provided to other criminal offenders. 387 U.S. 1, 27–28, 87 S. Ct. 1428, 1444 (1967). It reached this conclusion based in large measure on research showing procedural fairness promotes rehabilitation and reform. *See id.* at 26, 87 S. Ct. at 1443.

We also recognize that our constitution establishes a baseline, and courts are not alone in developing new standards to protect juvenile offenders from overly harsh sentencing. The legislature is uniquely suited to identifying and adopting additional substantive and procedural protections to further the constitutional recognition that "children are different." *See Seats*, 865 N.W.2d at 555 (quoting *Miller*, 567 U.S. at 478–80, 132 S. Ct. at 2469). For example, our legislature has already acted to authorize sentencing courts to suspend or defer the sentences of juveniles. *See* Iowa Code § 901.5(14). We would call attention to other efforts advocated by leading scholars in this area, such as reforming juvenile transfer laws, establishing appropriate facilities for juvenile confinement, sealing and expunging juvenile criminal records, and expanding access to educational and treatment programs while incarcerated, to name a few. *See* Drinan, 101 Iowa L. Rev. at 1825–26, 1828–31; Scott, 88 Temp. L. Rev. at 708–09, 712. Thus, we too now turn

back to understand why the factors have led to difficulties and to consider what can be done to provide greater guidance.

In doing so, we begin by emphasizing some basic propositions we have previously described. First, the factors generally serve to mitigate punishment, not aggravate punishment. *Lyle*, 854 N.W.2d at 402 n.8. Second, juvenile sentencing hearings are not entirely adversarial. The goal is to craft a "punishment that serves the best interests of the child and of society." *Id.* at 402. Third, the default rule in sentencing a juvenile is that they are not subject to minimum periods of incarceration. *See Null*, 836 N.W.2d at 74 ("First, the district court must recognize that because 'children are constitutionally different from adults,' they ordinarily cannot be held to the same standard of culpability as adults in criminal sentencing." (quoting *Miller*, 567 U.S. at 470–72, 132 S. Ct. at 2464)).

Finally, we note these factors have unique challenges on resentencing. Objective indicia of a juvenile's relevant characteristics may be difficult or impossible to obtain ten or twenty years later. However, the factors do not lose relevance. There are baseline "average developmental characteristics of youth of the age that the prisoner was when he or she committed the offense," which the parties can then use as evidence of the juvenile's conduct after the offense to show the juvenile "conformed to or departed from developmental norms." Scott, 88 Temp. L. Rev. at 702. Additionally, while objective indicia may be elusive, it may still be available in the form of contemporaneous medical records or school and disciplinary reports. *Id.* Interviews of relevant individuals' recollection, as opposed to their current perception, may also be helpful. *See id.* Applied to this record, we are not prepared to assume these inquiries were made but returned nothing.

**D. The Individualized Hearing.** Accordingly, we turn to analyze each factor to provide greater understanding of its role in juvenile sentencing. Properly applied, these factors ensure the constitutional guarantee against cruel and unusual punishment is satisfied.

1. *Age and features of youthful behavior.* The first factor is the "age of the offender and the features of youthful behavior." *Lyle*, 854 N.W.2d at 404 n.10. This factor is the basis for the core constitutional protection extended to juvenile offenders. *See id.* at 398 ("First and foremost, the time when a seventeen-year-old could seriously be considered to have adult-like culpability has passed."). The features of age that give rise to this protection include "immaturity, impetuosity, and [a] failure to appreciate risks and consequences." *Id.* at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468). The factor draws upon the features expected to be exhibited by youthful offenders that support mitigation and allows for the introduction of evidence at the sentencing hearing to show the offender had more or less maturity, deliberation of thought, and appreciation of risk-taking than normally exhibited by juveniles. This factor is most meaningfully applied when based on qualified professional assessments of the offender's decisional capacity. *See* Scott, 88 Temp. L. Rev. at 696–97 (describing use of "validated assessment methods," review of "the youth's facility under real-life conditions," and an expert's "developmental and clinical knowledge and experience to integrate [the] information").

Additionally, age is not a sliding scale that necessarily weighs against mitigation the closer the offender is to turning eighteen years old at the time of the crime. *See* Elizabeth S. Scott et al., *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 647 (2016) (noting "developmental

changes . . . continue into the early twenties"). When the *Miller* Court referred to "chronological age" in identifying the need to distinguish the criminal sentencing of children from adults, it did not suggest that a seventeen-year-old child is more deserving of adult punishment than a sixteen-year-old child, or a fifteen-year-old child more deserving than a fourteen-year-old child. *See Miller*, 567 U.S. at 476, 132 S. Ct. at 2467 ("[Y]outh is more than a chronological fact." (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 877 (1982))). It referred to "chronological age" as a unit of age that distinguishes children from adults. *See id.* The Court recognized that children within this unit have "signature qualities" of "immaturity, irresponsibility, 'impetuousness[,] and recklessness.' " *Id.* (alteration in original) (quoting *Johnson v. Texas*, 509 U.S. 350, 368, 113 S. Ct. 2658, 2669 (1993)). Thus, minority status is the designated factor that supports the special sentencing consideration and expert evidence may be used to conclude any particular juvenile offender possessed features of maturity beyond his or her years. This is not to say judges cannot and should not be alert to circumstances that might suggest the age of a particular offender might not support mitigation. Yet, categorical age groups do not exist for children to justify using age alone as a factor against granting eligibility for parole.

2. *Family and home environment.* The second factor is "the particular 'family and home environment' that surround the youth." *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468). This factor seeks to identify any familial dependency and negative influences of family circumstances that can be ingrained on children. Scott, 88 Temp. L. Rev. at 698. As with the first factor, expert testimony will best assess how the family and home environment may

have affected the functioning of the juvenile offender. *Id.* (describing the use of "psychometric measures," including " 'social maturity scales' . . . [that] assess the youth's degree of independence and self-direction in everyday functioning"). This factor does not rely on general perceptions, but specific measures of the degree of functioning. Furthermore, it is not limited to extremely brutal or dysfunctional home environments, but considers the impact of all circumstances and all income and social backgrounds.

3. *The circumstances of the crime.* The third factor considers the circumstances of the crime. *Lyle*, 854 N.W.2d at 404 n.10. Within these circumstances, attention must be given to the juvenile offender's actual role and the role of various types of external pressure. Thus, this factor is particularly important in cases of group participation in a crime. Expert testimony will be helpful to understand the complexity behind the circumstances of a crime when influences such as peer pressure are not immediately evident and will aid the court in applying the factor properly. *See* Scott, 88 Temp. L. Rev. at 698. Yet, the prominence of peer pressure in the analysis of this factor does not mean the factor cannot support mitigation for crimes committed alone. *See id.* ("[P]eer influence can play a more subtle role in adolescent behavior, as when teenagers engage in behavior that they think will win peer approval ('showing off,' for example), or simply encourage one another through group interaction."). Likewise, the circumstances of the crime do not necessarily weigh against mitigation when the crime caused grave harm or involved especially brutal circumstances. As the Court said in *Miller*, the special analysis for juveniles is not "crime-specific." 567 U.S. at 473, 132 S. Ct. at 2465. Mitigation normally is warranted in all crimes. The aggravating

circumstances of a crime that suggest an adult offender is depraved may only reveal a juvenile offender to be wildly immature and impetuous.

4. *Legal incompetency.* The fourth factor is the legal incompetency associated with youth. *Lyle*, 854 N.W.2d at 404 n.10. It mitigates against punishment because juveniles are generally less capable of navigating through the criminal process than adult offenders. *See* Scott, 88 Temp. L. Rev. at 699. Thus, the same shortsightedness of thought tied to juvenile behavior in the commission of a crime can also surface in their subsequent dealings in the legal process. These juvenile deficiencies can play out in general competency to stand trial or relate more specifically to cognitive or other incapacities to withstand police interrogation. *See id.* The relevance of this factor ultimately relates to the general proposition that youthful offenders are less able to confront the legal process. Whether a particular youth would be more capable than most would normally be a matter for expert testimony.

5. *Rehabilitation.* The final factor is the possibility of rehabilitation and the capacity for change. *Lyle*, 854 N.W.2d at 404 n.10. This factor supports mitigation for most juvenile offenders because delinquency is normally transient, and most juveniles will grow out of it by the time brain development is complete. *See* Scott, 88 Temp. L. Rev. at 700. Additionally, juveniles are normally more malleable to change and reform in response to available treatment. *Id.* at 701. The seriousness of the crime does not alter these propositions. *Id.* at 700. Thus, judges cannot necessarily use the seriousness of a criminal act, such as murder, to conclude the juvenile falls within the minority of juveniles who will be future offenders or are not amenable to reform. Again, any such conclusion would normally need to be supported by expert testimony. *Id.* at 701.

6. *Discretion exercised by the district court.* We appreciate the difficulty judges can often face when called upon to decide if juvenile offenders should be eligible for parole. Yet, the factors used to apply the constitutional principle at stake in this decision will best serve their purpose if sentencing courts remain committed to several key observations. First, the five factors identify the primary reasons most juvenile offenders should not be sentenced without parole eligibility. A sentence of incarceration without parole eligibility will be an uncommon result. Second, the factors must not normally be used to impose a minimum sentence of incarceration without parole unless expert evidence supports the use of the factors to reach such a result. Third, the factors cannot be applied detached from the evidence from which they were created and must not be applied solely through the lens of the background or culture of the judge charged with the responsibility to apply them. Perceptions applicable to adult behavior cannot normally be used to draw conclusions from juvenile behavior.

In the end, this case shows how the factors can be misused. The district court in this case misused the first factor—age and the features of youthful behavior—by considering the evidence at trial that Roby continued to engage in sexual abuse after he was confronted about his improper physical contact with the victim. This evidence does not in any way undermine the recognized failure of juveniles to appreciate risks and consequences and their tendency to make immature and impetuous decisions. Thus, the finding by the district court could have only been based on the court's own observation that the features of youth are overcome by the warning Roby received. No such evidence supported this finding.

The district court addressed the second factor—family and home environment—with evidence that Roby sexually abused the victim during the time the victim's family was providing him with a home. Again, this evidence does not undermine what the second factor seeks to convey— that family and home environment often can affect the functions of a juvenile. Thus, the finding by the district court was essentially unrelated to the factor. The district court seemed to suggest Roby acted with a sinister disposition by abusing the victim while the victim's family was helping provide him with a home.

The district court addressed the third factor—the circumstances of the crime—with evidence that the crime was not the result of peer pressure, Roby exhibited no concern for harm caused to the victim, and he betrayed the kindness of the victim's family. The role of peer pressure in juvenile crime does not make the absence of peer pressure an aggravating circumstance. Furthermore, a sentencing judge cannot normally draw such conclusions from the circumstances of the crime without expert testimony.

The district court in this case did not consider the fourth factor— legal incompetency. If this factor had been considered, the evidence showed Roby initially thought or pretended to think he was being investigated for stealing a video game, confessed to police during an interrogation that was subsequently suppressed by the court as involuntary, and may not have been adequately communicating on trial strategy with his attorney. All of this could be evidence of the legal incompetency we normally associate with youth.

Finally, the court addressed the fifth factor—rehabilitation—with evidence that Roby never admitted his criminal actions and has continued to deny committing a crime. It concluded this attitude did not

make him amenable to rehabilitation. While this evidence is relevant, no evidence was presented that Roby ever received any treatment to aid in rehabilitation. Overall, the evidence at sentencing was insufficient to support a conclusion that Roby was within the small group of juvenile offenders that never aged out of his delinquent conduct or was not amenable to rehabilitation.

7. *Summary.* On our review of the five factors identified in *Lyle*, bolstered by the recommendations of leading legal and medical professionals in this area, we conclude the district court abused its discretion by imposing a sentence of incarceration without parole eligibility. The evidence presented at the sentencing hearing could not, as a matter of law, support the imposition of incarceration without an opportunity for parole under the five factors that must be observed at sentencing to ensure that the punishment does not violate article I, section 17 of the Iowa Constitution. The district court applied the factors, but not in the manner required to protect the juvenile offender from cruel and unusual punishment.

## IV. Conclusion.

We conclude article I, section 17 of the Iowa Constitution does not categorically prohibit the imposition of a minimum term of incarceration without the possibility of parole on a juvenile offender, provided the court only imposes it after a complete and careful consideration of the relevant mitigating factors of youth. We recognize the difficulties of individualized hearings, but decline at this time to hold our constitution requires abandonment of the practice. Instead, we take this opportunity to provide additional guidance to our courts, attorneys, and juveniles on the use of the factors and the content of a sentencing hearing. While we conclude the district court abused its discretion in this case, we are

confident the additional direction provided by this case will lead to sentencing more consistent with our constitutional principles.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.**

Wiggins and Appel, JJ., join this opinion. Hecht, J., files a concurring opinion. Appel, J., files a separate concurring opinion in which Wiggins, J., joins. Zager, J., files a dissenting opinion in which Waterman and Mansfield, JJ., join.

**HECHT, Justice (concurring specially).**

I concur in the determination that Christopher Roby's prison sentence must be vacated. I write separately, however, to express my view that article I, section 17 of the Iowa Constitution prohibits a mandatory term of incarceration for any offense committed by a juvenile offender.

In *State v. Lyle*, 854 N.W.2d 378 (Iowa 2014), we concluded "a mandatory minimum sentencing schema . . . violates article I, section 17 of the Iowa Constitution when applied in cases involving conduct committed by youthful offenders." 854 N.W.2d at 402. We reasoned that a statute that "sends all juvenile offenders to prison for a minimum period of time under all circumstances simply cannot satisfy the standards of decency and fairness embedded in [our constitution]." *Id.* at 403. Our decision in *Lyle* left room, however, for the possibility that "[s]ome juveniles will deserve mandatory minimum imprisonment, but others may not," *id.*, and left this differentiation to the district court with due consideration of the *Miller* factors focusing upon "youth and its attendant circumstances as a mitigating factor." *Id.* at 402 n.8, 404 (citing *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012)). We noted the "keystone of our reasoning is that youth and its attendant circumstances and attributes make a broad statutory declaration denying courts this very discretion categorically repugnant to article I, section 17 of our constitution." *Id.* at 402–03.

In my subsequent concurring opinion in *State v. Seats*, 865 N.W.2d 545 (Iowa 2015), I expressed "my lack of confidence in [this court's] ability to conceive—or in sentencing courts' ability to apply consistently—a principled standard for identifying the uncommon or rare

circumstances" justifying a denial of an opportunity for parole for juvenile offenders sentenced to life in prison. 865 N.W.2d at 560 (Hecht, J., concurring). In that opinion, I explained why several of the *Miller* factors are not helpful in assessing the relative capacities of juvenile offenders for maturation and rehabilitation, and I concluded article I, section 17 mandates prohibition of life-without-parole sentences for all juveniles convicted of homicide offenses. *Id.* at 561–62, 563.

The infirmities of the *Miller* factors led me to reject them in *Seats* as a framework for identifying the rare juvenile offenders convicted of homicide who lack the capacity to mature and be rehabilitated. I now conclude the infirmities are no less profound when applied by judges sentencing juvenile offenders convicted of lesser offenses. Like the Supreme Judicial Court of Massachusetts, I believe the "back end" parole-board mechanism better accommodates juveniles' capacity for change than a "front end" irrevocable determination of eligibility for parole. *See Diatchenko v. Dist. Att'y*, 1 N.E.3d 270, 282–85 (Mass. 2013). The compelling reasons counseling against mandatory statutory deprivations of juvenile offenders' opportunities for parole should lead us to conclude there is no constitutionally sound basis for empowering judges to make calls on eligibility of juvenile offenders for parole based on unsound predictive criteria.

Consistent with this conclusion, I concur with the majority's conclusion that the sentence rendering Roby ineligible for parole for a term of seventeen and one-half years violated article I, section 17 of the Iowa Constitution.

**APPEL, Justice (concurring specially).**

I join in the court's opinion but write separately to emphasize why.

The court's opinion leaves the door ajar, at least in theory, that a juvenile offender might be sentenced to a lengthy adult minimum sentence. But, as we have now repeatedly stated, "children are constitutionally different" when it comes to sentencing for crimes. *State v. Null*, 836 N.W.2d 41, 65 (Iowa 2013) (quoting *Miller v. Alabama*, 567 U.S. 460, 470–72, 132 S. Ct. 2455, 2464 (2012)); *accord State v. Seats*, 865 N.W.2d 545, 556 (Iowa 2015); *State v. Lyle*, 854 N.W.2d 378, 395 (Iowa 2014). The multifactored *Miller* test, as shaped by this court, powerfully drives the analysis toward a finding that children are constitutionally different and therefore, as a general proposition, juvenile offenders cannot be sentenced to mandatory adult minimums.

Although we have not expressly said so, the State in theory may overcome these factors by presenting what amounts to a case of psychopathy demonstrating, among other things, resistance to change and a stunting of the ordinary maturation process. But so far, psychopathy measures during adolescence that have been developed by experts have unacceptable false positive rates when used to make individualized predictions. *See* Thomas Grisso & Antoinette Kavanaugh, *Prospects for Developmental Evidence in Juvenile Sentencing Based on Miller v. Alabama*, 22 Psychol., Pub. Pol'y, & L. 235, 240 (2015). According to a recent comprehensive review of the literature, available measures of psychopathy in adolescents "have not established a sufficiently high level of stability . . . to warrant testimony about whether a youth has a psychopathic personality disorder." *Id.* (quoting Gina M. Vincent et al., *Juvenile Psychopathy: Appropriate and Inappropriate Uses*

*in Legal Proceedings* in *APA Handbook of Psychology and Juvenile Justice* 219 (Kirk Heilbrun et al., eds., 2016)).

As a result, I do not think as a practical matter there is much difference between the court's approach and the categorical approach in *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016). The seventeen and one-half-year mandatory sentence in this case is less draconian than a life-without-the-possibility-of-parole sentence in *Sweet*, but the crimes are less serious, too. Although the stakes are lower, I think there are solid reasons to extend the categorical approach of *Sweet* to this case. Once again, of course, such an approach would not be an entitlement to early release, but only to a meaningful opportunity to show rehabilitation prior to the expiration of a seventeen and one-half-year mandatory sentence.

Nonetheless, for now I join the court's opinion. If implementation of this decision proves inconsistent, confusing, difficult, or unworkable, the obvious solution would be to move to the analysis in *Sweet* and categorically eliminate the application of adult mandatory minimum sentences to juvenile offenders.

Wiggins, J., joins this special concurrence.

**ZAGER, Justice (dissenting).**

The court giveth and the court taketh away. In part III.A–B of its opinion, the court correctly concludes that the Iowa Constitution does not categorically prohibit a district judge, after a hearing on all relevant factors, from sentencing a juvenile who commits a serious felony such as rape, armed robbery, or murder, to a minimum period of incarceration before the juvenile is eligible for parole. However, this correct but limited conclusion in III.A–B is subsequently undermined by other aspects of the opinion.

The court introduces a number of statements that go beyond what this court has decided in its prior juvenile sentencing opinions. For example, the court declares that minimum periods of incarceration need to be "short" and "uncommon." These statements can, and I expect will, be seized upon in future cases to strike down any minimum term of incarceration.

More directly, in part III.C–D, the court restates the relevant factors in a way that will make it difficult, if not practically impossible, for a sentencing judge to ever impose any minimum term of incarceration. These significant, practical implications are another impediment to our district court judges who expend substantial time and energy exercising their discretion in sentencing. Every application of every factor must weigh in favor of the defendant. I have repeatedly cautioned that this approach, in effect, removes any sentencing discretion from the district court and "bestows upon our appellate courts the freedom to impose their members' judgments about the appropriateness of a sentence." *State v. Lyle*, 854 N.W.2d 378, 412 (Iowa 2014) (Zager, J., dissenting).

Moreover, it is now apparent that expert testimony will be required on both sides before a juvenile can be sentenced to any minimum period of incarceration. The court's opinion thus endorses and perpetuates the cottage industry that has developed for mitigation experts—a burden not only for the district court judges and the State, but also for the juvenile defendants themselves, many of whom are represented by a public defender or who may otherwise be constrained by costs. In short, while the court has technically not invalidated all minimum terms of incarceration for juveniles, today's opinion will have that effect in the real world in which our district courts must operate. And the question that must be asked is: will the sentence of the district court be any more valid or constitutional? I don't believe so.

The majority opinion takes our state even farther away from the national consensus, but it provides no adequate justification for this continued extension in juvenile sentencing. The restatement of the relevant factors does not make sense, and the court's continued push to shift authority from our district court judges to the parole board will not achieve the outcomes it would like to see.

**I. Today's Extensions of *Lyle* Move Us Farther Away from Other Jurisdictions.**

Today's decision pulls Iowa farther away from the rest of the nation. In 2014, this court declared unconstitutional any sentencing law requiring individuals under the age of eighteen who committed felonies to be incarcerated for any mandatory minimum period of time. *See Lyle*, 854 N.W.2d at 400 (majority opinion). This rule applied no matter how heinous the crime, such as first-degree murder, or how short the period of incarceration, such as one year. *See id.* All such sentences were deemed cruel and unusual. To its credit, the majority acknowledged in

*Lyle* the uniqueness of its decision. "[W]e recognize no other court in the nation has held that its constitution or the Federal Constitution prohibits a statutory schema that prescribes a mandatory minimum sentence for a juvenile offender." *Id.* at 386.

Three years have passed since *Lyle* was decided. Not surprisingly, criminal defense lawyers in other jurisdictions have urged their states to follow *Lyle*. None have accepted the invitation. *See, e.g.*, *State v. Imel*, No. 2 CA–CR 2015–0112, 2015 WL 7373800, at *3 (Ariz. Ct. App. Nov. 20, 2015) ("[W]e disagree with *Lyle*'s characterization of the Court's holding in *Miller* [*v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012)]."); *People v. Rigmaden*, No. C071533, 2015 WL 5122916, at *18 (Cal. Ct. App. Sept. 1, 2015) (declining to follow *Lyle* while observing that "policy arguments about sentencing juveniles in light of current research on the developing brains of adolescents (neuroscience)" are "more properly directed to the Legislature"); *People v. Applewhite*, 68 N.E.3d 957, 964 (Ill. App. Ct. 2016) ("[W]e are not persuaded by the defendant's reliance on an Iowa Supreme Court case finding that all mandatory minimum juvenile sentences are unconstitutional."); *State v. Anderson*, No. 26525, 2016 WL 197122, at *11 (Ohio Ct. App. Jan. 15, 2016) ("The only authority Anderson cites directly supporting the proposition that all mandatory minimum sentences imposed on juveniles tried in adult court constitute cruel and unusual punishment is [*Lyle*]. . . . Upon review, we decline to adopt the majority approach in *Lyle*."); *State v. Barbeau*, 883 N.W.2d 520, 533–34 (Wis. Ct. App. 2016) (declining to follow *Lyle*).

In fairness, it should be noted the Washington Supreme Court recently held that under the Eighth Amendment, a trial court sentencing juveniles in the adult criminal justice system "must be vested with full discretion to depart from the sentencing guidelines and any otherwise

mandatory sentence enhancements, and to take the particular circumstances surrounding a defendant's youth into account." *State v. Houston-Sconiers*, 391 P.3d 409, 426 (Wash. 2017). Yet, the Washington court did not rely on its state constitution, did not mention *Lyle*, and did not hold that the trial court has an affirmative obligation to hold a hearing covering all the *Miller* factors in every case (as opposed to simply receiving and considering such evidence when it was offered). *Id.* at 419–20. Also, the Washington court confirmed that the trial court sentencing juveniles in the adult criminal justice system must be vested with "full discretion" to depart from prescribed sentences. *Id.* at 421. I have not seen such a confirmation of discretion in our sentencing judges in any of our juvenile sentencing opinions. While the Washington Supreme Court may have reached a "similar conclusion," it did not cite to our opinion.

In light of *Lyle*'s negative reception in other states, I think a more cautious approach is appropriate. Instead, today's opinion extends *Lyle*. Consider the following examples. In *Lyle*, we said "juveniles can still be sentenced to *long* terms of imprisonment, but not mandatorily." 854 N.W.2d at 401 (emphasis added). Just one year ago, in *State v. Sweet*, this court assured everyone that even doing away with the option of life without parole was only a "marginal" change because juveniles who committed murder would still serve "a *substantial period* of incarceration." 879 N.W.2d 811, 835 (Iowa 2016) (emphasis added). The majority now takes the opposite approach, walking away from its previously stated position. The majority says instead that "it may be appropriate retribution to incarcerate a juvenile for a short time without the possibility of parole" and "a sentencing judge could properly conclude a short term of guaranteed incarceration is necessary to protect the public." So "long" and "substantial" have now been replaced by "short."

If we keep changing the standards, how can we expect our district court judges to reliably apply *any* sentencing factors?

In *Lyle*, we said that "[s]ome juveniles will deserve mandatory minimum imprisonment, but others may not." 854 N.W.2d at 403. We added,

> [Trial] judges will do what they have taken an oath to do. They will apply the law fairly and impartially, without fear. They will sentence those juvenile offenders to the maximum sentence if warranted and to a lesser sentence providing for parole, if warranted.

*Id.* at 404. But today we announce that "[a] sentence of incarceration without parole will be an uncommon result." In other words, the district court's discretion to do what is warranted by the facts in front of it must give way to a mandate that, except in rare and yet undefined circumstances, the juvenile must be immediately parole eligible. In reality, the majority's opinion makes the district court's sentencing discretion merely illusory.

In *Lyle*, we distinguished between "inane juvenile schoolyard conduct" and "cold and calculated adult conduct," recognizing that some juvenile conduct was subject to deterrence. *Id.* at 401. Today, though, the majority concludes that "the justification of deterrence will normally be irrelevant to all juveniles." I strongly disagree. Both this court and the Supreme Court have continuously acknowledged that, while deterrence has *less* weight in the analysis of the penological justifications for juvenile sentencing due to the impetuosity of juvenile decision making, it still has *some* weight in every case. *Roper v. Simmons*, 543 U.S. 551, 570, 125 S. Ct. 1183, 1196 (2005) ("[T]he same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence."); *Lyle*, 854 N.W.2d at

399 ("We add that a deterrence rationale is actually *even less applicable* when the crime . . . is lesser."); *State v. Null*, 836 N.W.2d 41, 63 (2013) ("The [Supreme] Court concluded deterrence has less validity because of the 'impetuous and ill-considered' nature of juvenile decision making." (quoting *Graham v. Florida*, 560 U.S. 48, 72, 130 S. Ct. 2011, 2028–29 (2010))).

Now, we have again changed the standards and concluded that instead of simply having less weight in our analysis, deterrence is now "normally irrelevant to all juveniles." In practice, what does this mean? How is "less weight" different from "normally irrelevant," and how are our district court judges supposed to realistically apply this penological goal when the goalposts have shifted yet again? I think the court's observation on the irrelevance of deterrence would surprise most parents who believe that deterrence *can* be effective with their children. Indeed, there is a sense in which this court's ever-expanding juvenile jurisprudence demeans the great majority of youth who do *not* commit serious felonies.

This approach also moves us away from the *Model Penal Code: Sentencing* approach to juvenile sentencing. While the *Model Penal Code* gives priority to rehabilitation and reintegration into society, it does not foreclose the use of the penological goal of deterrence. Model Penal Code: Sentencing § 6.11A(b), at 215 (Am. Law Inst., Proposed Final Draft 2017); *id.* cmt. (c)(5), at 220–21. Thus, the *Model Penal Code* would allow for "the judge's ability to find, when supported by the facts, that an offender under 18 acted with an unusually high degree of personal blameworthiness." *Id.* at 218. It adds that courts "must also attend to the 'gravity of offenses' and the 'harms done to crime victims' when reaching final judgments of proportionality. The seriousness of the

victim injuries does not diminish when their assailants were underage." *Id.* Notably, the *Model Penal Code* is, as its name states, a model for adoption by legislatures, not a constitutional minimum. Yet even with this model, the consensus of the American Law Institute is that other considerations besides rehabilitation may enter into juvenile sentencing.

**II. There Is No Jurisprudential Basis for the Majority's Extensions of *Lyle*.**

These extensions of *Lyle* find no support in the text of article I, section 17, which only prohibits "cruel and unusual punishment[s]." Iowa Const. art. I, § 17. Ordering a sixteen- or seventeen-year-old who commits a rape, an armed robbery, or a murder to serve some amount of time before being eligible for parole is neither cruel nor unusual.

Nor do the majority's statements find support in established jurisprudence. For example, *Miller* indicated that the "harshest possible penalty," i.e., life without parole, should be "uncommon" for juvenile homicide offenders. 567 U.S. at 479, 132 S. Ct. at 2469 ("[W]e think appropriate occasions for sentencing juveniles to this *harshest possible penalty* will be uncommon." (Emphasis added.)). Today, as noted above, the court says that minimum prison terms of *any* length for juveniles should be uncommon. This twists words to give the impression that the court is simply following in the tracks of *Miller* when in reality, it is not.

To give another example, *Miller* said that juveniles are "less likely to consider potential punishment" before committing crimes. *Id.* at 472, 132 S. Ct. at 2465. As a general statement, that is probably true. But the majority takes *Miller* to an extreme by stating that "deterrence will normally be irrelevant to all juveniles." There is a big difference between holding that the less developed brain of juveniles should make it rare and difficult to give them the most serious punishment, as the Court did

in *Miller*, and holding that it should make it rare and difficult to punish them *at all*, which is the gist of today's decision.

As before, the majority draws heavily on law review articles as a basis for today's decision. In stark contrast to how it has been received by actual courts, the court's *Lyle* decision has been enthusiastically welcomed by law review writers. *See, e.g.*, Cara H. Drinan, *The* Miller *Revolution*, 101 Iowa L. Rev. 1787, 1817 (2016); Lindsey E. Krause, *One Size Does Not Fit All: The Need for a Complete Abolition of Mandatory Minimum Sentences for Juveniles in Response to* Roper*,* Graham*, and* Miller, 33 Law & Ineq. 481, 493 (2015); Elizabeth Scott et al., *Juvenile Sentencing Reform in a Constitutional Framework*, 88 Temp. L. Rev. 675, 707–08 (2016) [hereinafter Scott].

To be clear, legal scholarship plays a vital and necessary role in germinating new concepts, fusing other disciplines to law, and knocking down badly reasoned judicial opinions. But it is one thing to regard a nonpeer-reviewed law review article as a source of *ideas* and quite another to regard it as *authority*. Unlike a court, which in a meaningful way must live with its decision, law review writers have no skin in the game. They can freely expound without bearing the responsibility for an actual decision that (like *Lyle*) has real-world consequences.

**III. The Court Has Redefined the *Miller* Factors in a Way That Will Make It Practically Very Difficult to Sentence a Juvenile to Any Minimum Amount of Incarceration, Regardless of the Crime and the Characteristics of the Person Who Committed It.**

Over the last three years, *Lyle* has led to hundreds of sentencings and resentencings. District judges, prosecutors, and defense lawyers have worked countless hours to do what we asked them to do. Furthermore, the court of appeals has undertaken appellate review of numerous *Lyle* sentencings and resentencings. *See, e.g., State v. White,*

No. 15–0829, 2016 WL 4801436 (Iowa Ct. App. Sept. 14, 2016); *State v. Null,* No. 15–0833, 2016 WL 4384614 (Iowa Ct. App. Aug. 17, 2016); *State v. Zarate,* No. 15–0451, 2016 WL 3269569 (Iowa Ct. App. June 15, 2016); *State v. Chany,* No. 15–0340, 2016 WL 1705160 (Iowa Ct. App. Apr. 27, 2016); *State v. Tuecke,* No. 15–0617, 2016 WL 1681524 (Iowa Ct. App. Apr. 27, 2016); *State v. Bullock,* No. 15–0077, 2016 WL 1130311 (Iowa Ct. App. Mar. 23, 2016); *State v. Wise,* No. 15–0192, 2016 WL 894377 (Iowa Ct. App. Mar. 9, 2016); *State v. Davis,* No. 14–2156, 2016 WL 146528 (Iowa Ct. App. Jan. 13, 2016); *State v. Giles,* No. 15–0021, 2015 WL 9450810 (Iowa Ct. App. Dec. 23, 2015); *State v. Hajtic,* No. 15–0404, 2015 WL 6508691 (Iowa Ct. App. Oct. 28, 2015).

What our judges need and want from this court is an intelligent and practical roadmap to guide them in their sentencing decisions—that is, an illustration of a sentencing or resentencing that complies with this court's opinions and allows them the discretion to provide appropriate juvenile offenders with a minimum period of incarceration. But the court does not provide such a roadmap. Again, this court simply redefines the *Miller* factors in a way that will make it extraordinarily difficult to sentence a juvenile to any minimum term of imprisonment, regardless of the individual factors related to the person or any consideration of the crime he or she committed. The majority continues to focus on the defendant's potential for rehabilitation without giving any weight to public safety, deterrence, or incapacitation. Indeed, the majority's analysis only uses the word "victim" when quoting the district court. These newly redefined factors are not only unfair to our district court judges, but also unworkable.

**A. Chronological Age.** The first *Miller* factor is "the 'chronological age' of the youth and the features of youth, including 'immaturity,

impetuosity, and failure to appreciate risks and consequences.' " *State v. Ragland*, 836 N.W.2d 107, 115 n.6 (Iowa 2013) (quoting *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468). Yet, today's opinion provides a subtle change. The word "chronological" has been dropped. So, whereas *Miller* specifically distinguished between the seventeen-year-old and the fourteen-year-old, and emphasized that the cases before it involved fourteen-year-olds, according to today's opinion *all* ages under eighteen are a mitigating factor unless the State introduces "expert evidence [that the] offender possessed features of maturity beyond his or her years." This renders the age factor meaningless. We do not live in a fictional world where all children are above average. If all juveniles receive the same mitigation, unless the State offers expert evidence of superannuated wisdom, then in a real sense no one receives mitigation. The fourteen-year-old cannot be treated more leniently than the seventeen-and-a-half year-old who commits the same crime.

**B. Family and Home Environment.** The second *Miller* factor is the juvenile's "family and home environment." 567 U.S. at 477, 132 S. Ct. at 2468. *Miller* asked the court to consider the juvenile's "family and home environment . . . no matter how brutal or dysfunctional." *Id.* Now, instead of analyzing the extent a brutal or dysfunctional family situation "from which [a juvenile] cannot usually extricate himself [or herself]," *id.*, the majority seeks to impose the requirement of expert testimony to "assess how the family and home environment may have affected the functioning of the offender." Rather than allowing the district court to exercise its intellect and discretion in determining the mitigating weight of a particular juvenile's home environment, the majority now requires expert testimony based on "social maturity scales . . . [that] assess the degree of independence and self-direction in

everyday functioning" in *every* juvenile sentencing—even if the juvenile may come from a seemingly well-functioning family background. Scott, 88 Temp. L. Rev. at 698. The Supreme Court's decision in *Miller* focused on the extreme—a brutal or dysfunctional family environment from which a juvenile cannot extricate themselves. *See Miller,* 567 U.S. at 477–78, 132 S. Ct. at 2468. As mitigating evidence, the Court found relevant that Evan Miller's stepfather abused him, that his mother was an alcoholic and a drug addict, and that he spent years in and out of the foster care system. *Id.* at 478–80, 132 S. Ct. at 2469. The majority takes away the district court's ability to make an informed decision based on its own observations and perceptions. Instead of allowing a dysfunctional home environment to serve as a mitigating factor, every juvenile's home environment must be analyzed by an expert to offer an opinion on the degree of dysfunction. Why must a juvenile's home and family environment always count as a *mitigating* factor? What about the case of "affluenza" where a juvenile raised by a loving family in a wealthy neighborhood commits a heinous crime?

**C. The Circumstances of the Crime and Family or Peer Pressures.** The third *Miller* factor asks the court to consider "the circumstances of the homicide offense, including the extent of [the youth's] participation in the conduct and the way familial and peer pressures may have affected [the youth]." *Id.* at 477, 132 S. Ct. at 2468. From this, we have applied the factor across the board to any crime committed by a juvenile. In the cases the Supreme Court considered in *Miller,* neither of the juveniles acted alone when they committed their crime, which illustrated the extent to which peer pressure can affect a juvenile in the moment. *Id.* at 477–80, 132 S. Ct. at 2468–69. However, the majority now asks our district court judges to analyze the extent to

which peer or family pressure affected a juvenile, even when the juvenile acted alone. Scott, 88 Temp. L. Rev. at 698 ("[P]eer influence can play a more subtle role in adolescent behavior, as when teenagers engage in behavior that they think will win peer approval . . . ."). How is a district court judge to do this? This court offers no guidance on a principled application.

The court concludes with the observation that "[m]itigation normally is warranted in all crimes." So, as with the age factor, every circumstance apparently serves as mitigation. Again, this has the unfortunate side effect of treating the juvenile who was truly pressured into committing his or her crime the same as the juvenile who committed a solo, cold-blooded offense.

**D. Incompetence of Youth as It Affects the Legal Process.** The fourth *Miller* factor considers the ways a juvenile's age may affect his or her ability to deal with police officers, prosecutors, or their own attorney. *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468. Here, too, rather than focusing on the facts of the case before it and the juvenile's *actual* experience with police, prosecutors, and his attorney, the majority imposes the requirement of expert testimony to determine whether "a particular youth would be more capable than most" in navigating the legal process. While I can certainly see the benefit of expert testimony in limited circumstances, I think our sentencing judges can often look at the facts and circumstances involving the juvenile, and make an informed determination of this issue in the exercise of their full discretion, without the necessity of expert testimony.

Additionally, how is this factor to be applied when we are dealing with an initial sentencing rather than a resentencing? Once a juvenile has been convicted of, for example, a forcible felony, does trial counsel

then need to present expert testimony on how the youth navigated the just-completed trial in front of the district court judge? If so, doesn't trial counsel need to withdraw so there can be new counsel for sentencing?

**E. Rehabilitation.** The last *Miller* factor is the juvenile's "possibility of rehabilitation." *Id.* This factor takes into consideration whether a juvenile's actions demonstrate the transient immaturity of youth rather than "irreparable corruption." *Id.* at 479–80, 132 S. Ct. at 2469 (quoting *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197). Notably, the concept of "irreparable corruption" originated in *Roper* in the context of capital punishment and continued with life-without-parole sentences at issue in *Miller*. It really has no bearing on cases where the juvenile offender will be released after a period of years. The issue is simply whether the sentencing judge can prescribe *some* amount of time the juvenile must serve before being parole eligible.

Again, however, the majority cushions its language to make the district court's job nearly impossible—it "cannot *necessarily* use the seriousness of a criminal act, such as murder, to conclude the juvenile falls within the minority of juveniles who will be future offenders." This leaves the question open as to when, if ever, a district court *can* use the seriousness of a criminal act as anything other than a mitigating factor.

From the above review of the *Miller* factors, and the new restrictions and guidance provided by the majority, it seems abundantly clear that the district court still has no sensible direction as to how to effectively apply the *Miller* factors in its sentencing decisions. In effect, the majority is imposing a de facto, categorical ban on any minimum prison sentence for a juvenile offender, whether the underlying sentence required any mandatory sentence or not. As I and several of my colleagues have repeatedly argued, if this is the direction the court wants

to take, then be direct enough to just say it. Let's stop wasting all the time, resources, and money on a sentencing approach that is impractical and unworkable. It is a burden on our court system and a burden on our district court judges who look to our opinions for guidance.

**F. Model Penal Code: Sentencing.** The *Model Penal Code: Sentencing* has recently been drafted to submit to the American Law Institute. It specifically addresses some of the factors discussed above.

As it pertains to an offender's age, it notes that "age shall be a mitigating factor, to be assigned greater weight for offenders of younger ages." Model Penal Code: Sentencing § 6.11A(a), at 215. This is more in line with the mandates of *Miller* than today's ruling. In *Miller*, the court noted that both of the defendants were fourteen years old—a different situation than if both had been seventeen. *Miller*, 567 U.S. at 477–78, 132 S. Ct. at 2468. The *Model Penal Code* approach preserves this common-sense approach, that the fourteen-year-old offender *is* different from the seventeen-year-old offender. It still, however, preserves the idea that juveniles of all ages are still less blameworthy than adults. Model Penal Code: Sentencing § 6.11A, cmt. *c*, at 217 ("[O]ffenders under 18 should be judged less blameworthy for their criminal acts than older offenders—and age-based mitigation should increase in correspondence with the youthfulness of individual defendants."). Age alone, however, need not always be a mitigating factor. *Id.* cmt. *c*, at 218. "[A] sentencing judge might find an offender unusually culpable—despite his [or her] youth—if guilty of a violent offense committed only for a thrill, or for sadistic purposes, or out of racial animus." *Id.*

The *Model Penal Code* acknowledges that peer pressure is a concern that should be weighed, but not a mitigating factor in every case. *Id.* at 219.

> While normally developing human beings possess a moral sense of morality from their early years, important capacities of abstract moral judgment, impulse control, and self-direction in the face of peer pressure, continue to solidify into early adulthood. The developmental literature suggests that offenders under 18 may be held morally accountable for their criminal actions in most cases, but assessments of the degree of personal culpability should be different for older offenders.

*Id.* at 219–20. In other words, if peer pressure is an issue in the case, it should certainly be weighed as a mitigating factor. We saw this in *Miller*, where both defendants acted with peers when they committed their crimes. However, the majority takes it one step too far by proposing that peer pressure is at issue in *every* case, even when the defendant acted alone.

The *Model Penal Code* also places a premium on the goal of rehabilitation for juvenile offenders. *Id.* at 219–21. However, it does so without foreclosing the possibility that rehabilitation will not work in every case, for every offender. *Id.* at 220.

> Many believe that adolescents are more responsive to rehabilitative sanctions than adult offenders. While the evidence for this proposition is mixed, it is clear that some rehabilitative programs are effective for some juvenile offenders. Success rates are at least comparable to those among programs tailored to adults.

*Id.* While society has a "greater moral obligation" to attempt to rehabilitate juvenile offenders, common sense tells us that rehabilitation will not work for every offender.

**IV. Replacing Trial Judge Discretion with Parole Board Discretion Does Not Necessarily Mean Fairer Sentences.**

*Lyle* eliminated legislative control over how long a juvenile who committed a serious felony could be incarcerated. Today's decision effectively eliminates judicial control over juvenile sentences by making it essentially impossible to send a juvenile who commits a crime to prison

for any minimum amount of time. Now, control is vested exclusively in the parole board.

The parole board has a statutory duty to release a person under the following circumstances:

> The board shall release on parole or work release any person whom it has the power to so release, when in its opinion there is reasonable probability that the person can be released without detriment to the community or to the person. A person's release is not a detriment to the community or the person if the person is able and willing to fulfill the obligations of a law-abiding citizen, in the board's determination.

Iowa Code § 906.4(1) (2017). In other words, the board is obligated to release an individual as soon as the individual is rehabilitated. This explains the court's preference for parole board discretion: whereas district court judges can and do consider *all* the traditional goals of sentencing—including punishment and deterrence—the parole board may only consider whether the individual has been rehabilitated.

On paper, this should work in the juvenile's favor. In practice, I am not so sure. The parole board has five members; only two of them work full-time. *See id.* § 904A.1. These members are responsible for making all parole decisions in Iowa. *Id.* § 904A.4(1). Collectively, in FY2016, they completed 11,468 deliberations resulting in 3767 paroles and 1611 work releases. *See* Iowa Bd. of Parole, *Annual Report Fiscal Year 2016*, https://www.legis.iowa.gov/docs/publications/DF/804753. pdf, at 2. It is simply unfair and unrealistic to expect the parole board to devote the same time and attention, on average, to a particular offender that a district court judge does in its consideration of an appropriate sentence for a juvenile offender.

Furthermore, the parole board's determination will be influenced heavily by the defendant's behavior in prison, as reported by the

department of corrections. *See* Iowa Code § 906.5(3); Iowa Admin. Code r. 205—8.6. One of the main points the court makes today is that a juvenile's conduct *as a juvenile* has limited value in predicting the person's capacity for future law-abiding behavior. According to the court, we need to see the person *as an adult*—i.e., how the person acts in prison. This focus on an offender's behavior in a prison environment will benefit some defendants, but hurt others.

Additionally, there is no right to counsel at parole hearings as there was at sentencing. *See* Iowa R. Crim. P. 2.28(1). So the former juvenile will not have the benefit of a lawyer to help them make his or her case, as he or she did at sentencing.

Also, given this court's view that juveniles who commit serious crimes should not face societal *punishment*, but only be *detained* until rehabilitation is demonstrated to the parole board, it makes little sense for district court judges to be concerned about the maximum time to be served. Thus, while the legislature has given courts discretion to suspend that maximum sentence in whole or in part, why make that difficult decision if the person can be released anyway as soon as the parole board deems him or her rehabilitated?

While I respect the herculean efforts of the parole board, I continue to doubt that it is a more appropriate body to determine whether a juvenile warrants incarceration rather than our district court judges.[5] Most significantly, the parole board considers a number of other factors in making its decision to release someone. Some of these factors include

---

[5] *Sweet*, 879 N.W.2d at 852–53 (Zager, J., dissenting) ("Last, with all due respect, I question whether the board of parole is better able to discern whether the juvenile offender is irreparably corrupt after time has passed, and after opportunities for maturation and rehabilitation have been provided.").

rule changes or overcrowding. There may be political or budgetary considerations that may affect release decisions. Therefore, these decisions may be made based on factors completely unrelated to *Miller*, which this court has spent considerable time and effort attempting to define—and redefine. Ultimately, I continue to believe the majority improperly delegates sentencing duties and responsibilities to the parole board, when this is a duty that is properly vested with the district court.

**V. Juveniles Who Commit Serious Crimes Should Be Subject to Punishment for Those Crimes.**

Throughout all of our cases on juvenile sentencing reform, we have never sought to *excuse* the behavior of a juveniles' criminal act, but rather to impose punishment in a way that takes into account the lesser culpability and greater capacity for change of juvenile offenders. *See, e.g., Null*, 836 N.W.2d at 75 ("[W]hile youth is a mitigating factor in sentencing, it is not an excuse."). "The constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today." *Lyle*, 854 N.W.2d at 398. In other words, this analysis requires that we consider both the crime and the punishment. Tying the district court's hands by making the factors nearly impossible to apply in a principled manner disproportionately weighs the analysis so the district court is only able to consider the juvenile's age and lessened culpability. Completely lost is any consideration of the harm the juvenile offender caused to his or her victim. Another downside to immediate parole eligibility in place of a discretionary minimum prison term is that many victims and their family members will feel compelled to attend the parole hearings to urge continued incarceration. Each hearing will reopen the wounds scarred

over from the defendant's crime and thereby revictimize the victims and their families.

There are a number of objectives that must be weighed when sentencing an offender under the age of eighteen: "offender rehabilitation, general deterrence, incapacitation of dangerous offenders, restitution to crime victims, preservation of families, and reintegration of offenders into the law-abiding community." Model Penal Code: Sentencing § 6.11A, cmt. *c*, at 218. Proportionality does not require that these objectives be ranked in any particular hierarchy; rather, the district court must analyze the circumstances before it and weigh the gravity of the offense and the harm done to the victim before reaching a final judgment of sentence. *Id.* Generally, however, rehabilitation and reintegration will have priority over the other goals. *Id.* at 218–19. An exception remains for dangerous or unusual criminal offenses. *Id.* at 219. This is consistent with the approach we have taken in the past, where we have noted that the lessened culpability of juvenile offenders must be taken into account during sentencing, but the harm caused to a victim should not be left out of the equation. *See, e.g.*, *Lyle*, 854 N.W.2d at 398. What the majority's opinion fails to appropriately acknowledge is that "[t]he seriousness of victim injuries does not diminish when their assailants were underage." Model Penal Code: Sentencing § 6.11A, cmt. *c*, at 218.

As applied to the resentencing of Christopher Roby, the district court weighed each of the *Miller* factors. The district court noted that Roby committed the sexual abuse against his victim when he was sixteen and seventeen years of age. Additionally, he had been caught improperly touching his victim and even banned from the victim's house for a period

of time.  These factors weigh against the impetuosity and immaturity of youth.

The district court also considered Roby's family and home environment.  The district court noted that his family and home environment were "not the best," but the victim's family stepped in and attempted to provide a stable home for him.  Despite this support, Roby chose to repeatedly take advantage of his victim in her home.

The district court considered peer pressure in its sentencing decision.  Roby acted alone—indeed, Roby continued to pressure his victim to keep his abuse secret.  Additionally, Roby was living with the family of the victim and keeping his abuse quiet, which is the opposite of acting under peer or family pressure.

The district court did not consider Roby's ability to deal with police, prosecutors, or his attorney on resentencing.  However, his victim did not report the abuse until after Roby had turned eighteen.  Because of his age, Roby's contact with the legal system and his communication with his own attorney did not occur until he was an adult.

Last, the district court noted that Roby displayed a concerning lack of rehabilitation.  Although the sexual abuse perpetrated by Roby occurred at ages sixteen and seventeen, the district court found he expressed no remorse for his actions as an adult.  Pertinently, even after ten years of incarceration, Roby maintains that the court is only punishing him and that he deserves to "get on with his life," with no remorse or empathy for his victim.

A good indicator of Roby's prospects for rehabilitation is his behavior in prison.  He received twenty-eight disciplinary infractions before his resentencing hearing.  Most troubling is his sexual misbehavior in prison after turning age twenty-five, when his brain was

fully developed according to the social science relied on in *State v. Bruegger*, 773 N.W.2d 862, 879 n.5 (Iowa 2009). He acted out sexually by inappropriately touching a female prison guard. His inability to behave in a controlled environment, even at age twenty-five, foretells an inability to behave if he is released into society. The majority opinion does not require the sentencing court to turn a blind eye to Roby's postsentencing behavior. In the next resentencing hearing, the State should supplement the record with Roby's prison disciplinary history since the last hearing. The State should also update the court as to whether Roby has remained ineligible for the sex offender treatment program based on his continuing refusal to admit guilt.

On resentencing Roby, the district court imposed the identical sentence originally imposed. The court weighed the *Miller* factors while also recognizing the significant impact on the victim. After weighing all of the necessary factors, and noting Roby's complete lack of remorse, the district court concluded the original sentence, including the mandatory minimum sentence, was appropriate. The district court did exactly what we asked of it. No amount of redefinition by this court, or the requirement of expert testimony on each issue, will dissuade me that the district court, in its broad discretion, entered an appropriate sentence. I would affirm the district court resentencing.

## VI. Conclusion.

I am no admirer of our state's existing mandatory minimum sentencing laws. In my view, some of the minimums are far too long and, as a result, they treat many offenders unfairly. I would like to see our legislature revise these laws beyond the limited reforms to date. An important next step would be to reduce the mandatory minimum for

most class "B" felonies to something less than the existing seventeen and one-half years—the sentence Roby has been serving.

But my criticism of these laws is not age-specific. These sentencing laws are unfair for all ages. Amendment of these laws for everyone would be preferable to today's decision which effectively invalidates all minimum prison terms of any juvenile offender. Unfortunately, today's decision (1) isolates Iowa even further in this area of the law; (2) redefines the *Miller* factors in a way that will likely deter our district court judges from trying to impose any kind of minimum prison term on a juvenile, no matter how horrific the crime; yet (3) may have unintended consequences that actually harm juveniles. For all these reasons, I dissent.

Waterman and Mansfield, JJ., join this dissent.